1

**Bottini & Bottini, inc.**
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
  achang@bottinilaw.com
Anne Beste (SBN 326881)
  abeste@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:     (858) 914-2002

2

3

4

5

6

7

*Attorneys for Plaintiff Noelle Lee*

8

9

10

11

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

12

13

NOELLE LEE, derivatively on behalf of
THE GAP, INC.,

14

                                        Plaintiff,

15

         vs.

16

ROBERT J. FISHER, SONIA SYNGAL,
ARTHUR PECK, AMY BOHUTINSKY,
AMY MILES, ISABELLA D. GOREN, BOB
L. MARTIN, CHRIS O'NEILL, ELIZABETH
A. SMITH, JOHN J. FISHER, JORGE P.
MONTOYA, MAYO A. SHATTUCK III,
TRACY GARDNER, WILLIAM S. FISHER,
DORIS F. FISHER, and DOES 1–30,

17

18

19

20

21

                                        Defendants,

22

         – and –

23

THE GAP, INC.,

24

                                        Nominal Defendant.

25

26

Case No. _____

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT FOR:**
1. **BREACH OF FIDUCIARY DUTY;**
2. **AIDING AND ABETTING**
   **BREACH OF FIDUCIARY DUTY;**
3. **ABUSE OF CONTROL;**
4. **UNJUST ENRICHMENT; AND**
5. **VIOLATION OF SECTION 14(A)**
   **OF THE SECURITIES**
   **EXCHANGE ACT OF 1934.**

**DEMAND FOR JURY TRIAL**

27

28

1

## Table of Contents

I.      INTRODUCTION ...................................................................................................1

II.     NATURE AND SUMMARY OF THE ACTION .........................................................4

III.    JURISDICTION AND VENUE................................................................................12

IV.     INTRADISTRICT ASSIGNMENT ..........................................................................13

V.      THE PARTIES.....................................................................................................13

        A.      Plaintiff .................................................................................................13

        B.      Nominal Defendant ...............................................................................13

        C.      Officer Defendants................................................................................13

        D.      Director Defendants..............................................................................14

        E.      Doe Defendants .....................................................................................16

        F.      Unnamed Participants ..........................................................................16

VI.     RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS........17

        A.      Responsibilities of the Individual Defendants....................................17

        B.      Fiduciary Duties of the Individual Defendants...................................19

        C.      Breaches of Fiduciary Duties by the Individual Defendants........................20

        D.      Conspiracy, Aiding and Abetting, and Concerted Action...........................20

VII.    SUBSTANTIVE ALLEGATIONS...........................................................................22

        A.      Gap's CEO and Key Executive Team...................................................22

        B.      At All Relevant Times, the Individual Defendants Have Had Actual
                Knowledge that Gap Has Failed to Comply with Its Own Policies of
                Promoting Diversity and Prohibiting Discrimination, Yet the
                Individual Defendants Have Continued to Refuse to Nominate
                Black Individuals and Minorities to the Board.................................24

i

C.    Background of Additional Disclosures Mandated by the SEC in Proxy Statements Relating to the Process by Which Individuals Are Nominated to the Boards of Directors of Publicly-Traded Companies ...................................................................................28

D.    False and Misleading Statements Made by the Director Defendants in Gap's 2019 & 2020 Proxy Statements............................................35

E.    The Directors' Roles and Committees at Gap ................................60

F.    The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure Diversity on the Board and Among Managers and Executives at the Company ....................................61

G.    The Unjust Compensation Awarded to the Individual Defendants ...........64

VIII.   THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES ............................71

IX.    DEMAND FUTILITY....................................................................72

A.    Demand Is Futile Against the Officer Defendants .........................72

B.    Demand is Futile as to the Fisher Family Directors Because They are Controlling Shareholders and are Not Independent ....................................73

C.    Demand Is Excused Because a Majority of the Director Defendants is Either Not Independent or is Conflicted Because These Defendants Face a Substantial Likelihood of Liability Arising From Their Misconduct....................................................................74

D.    The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith...............76

E.    Demand is Futile as to the Members of the Governance & Sustainability Committee......................................................77

X.    CAUSES OF ACTION ...............................................................78

XI.    PRAYER FOR RELIEF ...............................................................84

ii

Plaintiff Noelle Lee ("Plaintiff") submits this Verified Shareholder Derivative Complaint against certain directors and officers of nominal defendant The Gap, Inc. ("Gap" or the "Company") for, *inter alia*, violations of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, and unjust enrichment.  In support of these claims, Plaintiff alleges the following upon (1) personal knowledge with respect to the matters pertaining to herself; and (2) information and belief with respect to all other matters, based upon the investigations undertaken by her counsel, which include a review of Gap's legal and regulatory filings, press releases, analyst reports, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    INTRODUCTION

"*Being an inclusive company isn't optional. For us, striving for equality is just as much of a business imperative today as it was 50 years ago when we started out.*

*We are inclusive, by design. Intentionally. Specifically. With purpose.*"[1]

1.    Despite its supposed "imperative" to be inclusive, Gap has failed to create any meaningful diversity at the very top of the Company — the Board of Directors (the "Board").  The Gap Board has lacked diversity at all relevant times, and lacks a single African American director.  The following are the current members of the Board:

/ / /

/ / /

/ / /

/ / /

---

[1] *See* https://www.gapinc.com/en-us/values/diversity-inclusion, last visited July 27, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

**Amy Bohutinsky**



**Amy Miles**



**Isabella D. Goren**



**Bob L. Martin**



**Chris O'Neill**



**Elizabeth A. Smith**



SHAREHOLDER DERIVATIVE COMPLAINT

**John Fisher**



**Jorge P. Montoya**



**Mayo A. Shattuck III**



**Robert J. Fisher**



**Sonia Syngal**



**Tracy Gardner**



SHAREHOLDER DERIVATIVE COMPLAINT

**William S. Fisher**                    **Doris F. Fisher**

      

## II.     NATURE AND SUMMARY OF THE ACTION

2.     Despite claiming that "We are inclusive, by design. Intentionally. Specifically.  With purpose,"[2] Gap has failed to create any true racial or ethnic diversity at the very top of the Company – on its Board of Directors and executive management team.  Gap's Directors, wishing to avoid public backlash, have repeatedly made misrepresentations in the Company's public statements by claiming to have a multitude of policies, internal controls, and processes designed to ensure diversity both at the management level and the Board itself.

3.     Gap also has repeatedly represented to its shareholders that it actively and "aggressively" evaluates the composition of its Board to ensure compliance with not just the law, but also its own stated corporate governance principles.  The Company's Investor Relations website states:

> ***Gap Inc. will continue to aggressively evaluate the skill set of our board against*** *our business needs to ensure our standards not only meet the requirements of the law, but are consistent with **our shareholders' best interests and corporate governance best practices**.*[3]

---

[2] *See* https://www.gapinc.com/en-us/values/diversity-inclusion, last visited July 27, 2020.

[3] *See* https://www.gapinc.com/en-us/about/leadership/board-of-directors, last visited Aug. 12, 2020.

4

4.      Gap's Board, which has no Black individuals, has consciously failed to carry out Gap's written proclamations about increasing diversity in its ranks.   The Board, as well as the Company's executive officers, remain devoid of Black people and other minorities.   When Gap does hire African Americans and other minorities, it overwhelmingly hires them for low-level and low-paying jobs in its distribution centers. As the following charts demonstrate, African Americans only comprise 4% of employees at the Company's headquarters, but comprise 23% of employees at the Company's distribution centers:



5.      Gap's Directors have deceived stockholders and the market by repeatedly making false assertions about the Company's commitment to diversity.   In doing so, the Directors have breached their duty of candor and have also violated the federal proxy laws.   Their conduct has also irreparably harmed Gap.   For those who care about diversity, inclusion, and honesty, those who do not adhere to these principles should be boycotted, especially if the perpetrator is one of the largest and most influential corporations in San Francisco.

5

SHAREHOLDER DERIVATIVE COMPLAINT

6.      "Companies need to be intentional about increasing the diversity of their executive leadership teams," says Crystal Ashby, president and CEO of the Executive Leadership Council, an organization of black senior executives that works to increase inclusivity in business leadership. "The culture of an organization is cultivated by its leaders." *Id.*

7.      As one individual has aptly stated: "We've seen anemic progress to date but **this is a watershed moment that must spur private and public boards into accelerated action**," says Janet Foutty, executive chair of the board for Deloitte, which has separately researched board diversity among Fortune 500 companies.[4]

8.      Founded in 1969, Gap's Board today in 2020 has no African-Americans and no Latinos; and no Asian-Americans or other minority representatives aside from Sonia Syngal.

9.      Simply put, Gap has no *real* commitment to racial or ethnic diversity at the top of the Company, and its Board is turning a blind eye to the Company's failure to ensure the "diversity" trumpeted by the Company's Directors in Gap's filings with the Securities and Exchange Commission ("SEC") and its annual reports to shareholders.

10.     The Director Defendants named herein all signed each of Gap's annual proxy statements.  With such signatures come an obligation to ensure that the statements in the Proxy were true and accurate, and to correct any misleading statements.  They failed to do so.

11.     As demonstrated herein, the Defendants knew of, but failed to disclose, unlawful business practices at Gap that put the Company at material risk — namely, a lack of diversity at the top of the Company and discriminatory hiring and compensation

---

[4] *See* "Kerri Anne Renzulli, "*The 20 Largest U.S. Companies Without a Black Person on Their Board*," NEWSWEEK, June 17, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

practices. Had this information been disclosed, shareholders would not have voted to reelect Board members, approve executive compensation packages, and reject an independent Board chairman.

12. In the wake of the Black Lives Matter movement, Gap has admitted that it has failed to achieve diversity with respect to minorities:

> We believe our teams should look like the communities we serve. While, we are well represented by gender, ***we have work to do across all levels and functions to fully represent Black and Latinx employees***.[5]

13. The shareholder derivative lawsuit has been the only judicial mechanism for shareholders to hold directors accountable for engaging in wrongdoing.  Like the United States Supreme Court, California courts have long recognized that derivative suits play an important role in corporate governance where directors fail to do their jobs:

> The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution. Where a derivative suit is against outsiders for wrongs against the corporation the directors can usually be expected to decide impartially on the advisability of suing. But the management cannot be expected to sue themselves for their own misdeeds.

*Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)).  As the California Supreme Court recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here, the company's board and management fail to perform their duties, stockholders have a "right" to bring derivative actions.  *See* 1 Cal. 3d 93, 107 (1969).  The courts of Delaware, Gap's state of incorporation, likewise acknowledge that derivative actions serve an important function: "The machinery of corporate democracy and the derivative suit are

---

[5] *See* https://www.gap.com/browse/info.do?cid=1160596&ak_t=74E8807F7793274F464FD8B911DB651717DC9574CD6400000359305FE5525074, last visited August 9, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

1   potent tools to redress the conduct of a torpid or unfaithful management." *Aronson v.*

2   *Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*,

3   746 A.2d 244 (Del. 2000).

4        14.     Plaintiff, derivatively on behalf of Gap, seeks the following relief from the

5   Director Defendants:

6        (a)     At least two of Gap's directors should immediately resign prior to

7   the Company's annual meeting which is scheduled for May 2021 and should

8   insist that the Company nominate two Black persons;

9        (b)     All Director Defendants named in this suit should return all their

10   2020 compensation received from Gap (including any stock grants), and donate

11   the money to an acceptable charity or organization whose efforts include the

12   advancement of Black people and minorities in corporate America;

13        (c)     Gap should institute salary history bans and should agree to publish

14   an annual Diversity Report that contains more particularized information about

15   the hiring, advancement, promotion, and pay equity of all minorities at Gap in all

16   its U.S. locations;

17        (d)     Gap should create a $700 million fund to hire Black individuals and

18   other minorities, promote minorities to more management positions at the

19   Company, establish and maintain a mentorship program at Gap for minorities

20   that is committed to providing the skills and mentorship necessary to succeed in

21   corporate America;

22        (e)     Gap should require annual training of its entire Board and all

23   Section 16 executive officers, which training should at a minimum focus on

24   diversity, affirmative action, anti-discrimination and anti-harassment, as well as

25   other relevant topics;

26        (f)     Gap should immediately set specific goals with respect to the

27   number of Black individuals and minorities to hire at the Company over the next

28

SHAREHOLDER DERIVATIVE COMPLAINT

five years, and Gap should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of minority diversity goals; and

(g)     Gap should replace Deloitte & Touche LLP as its auditor.  Gap is one of Deloitte's largest customers, and Deloitte has served as Gap's auditor *since 1976*, giving rise to a cozy and clubby relationship between Deloitte and Gap which is not conducive to effective auditing.  The Company's compliance with its stated policies concerning the alleged commitment to diversity has been abysmal to the point of being basically non-existent.  The very purpose of an auditor is to assess the Company's internal controls and determine if they are functioning effectively.  Rather than doing so, Deloitte has wrongfully and consistently given Gap's internal controls a clean bill of health and has failed to point out the obvious – that Gap lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

15.     The Individual Defendants' misconduct has caused severe financial and reputational damage to Gap.

16.     While systematically underpaying minorities and women, Gap's controlling shareholder – the Fisher family – has used the money saved to amass billions of dollars for themselves.  Gap's 2019 Proxy Statement disclosed that "The aggregate total beneficial ownership of Mrs. Doris F. Fisher and Messrs. John J. Fisher, Robert J. Fisher, and William S. Fisher, including charitable entities for which one or more of the Fishers is a trustee, is 42.7% of the outstanding shares."

17.     The fact that the Fisher family has made billions of dollars from the success of the Company makes their failure to achieve real diversity at the top of the Company all the starker.  As Forbes noted last year, Gap's stock tanked 34% last year amid

SHAREHOLDER DERIVATIVE COMPLAINT

1    mismanagement by the Company's over-paid top executives, yet the Fisher family is still
2    worth over $8 billion:

> Shares of Gap are down 34% in 2019, dropping the value of the Fisher's family's stake in the retailer from $4 billion in January to $2.3 billion as of Tuesday, Forbes estimates. The Fisher family now has a collective net worth of $7.3 billion, Forbes estimates. Fisher and her sons, John, Bob, and Bill Fisher were worth $8.3 billion in January, Forbes reported.

> Fisher, 88, founded Gap with her late husband Don in 1969 and served as Gap's chief merchandiser until 2003, according to Forbes. Fisher's family controls 43% of the company through various trusts and limited-liability companies and three of the 13 seats on the company's board, according to Fortune.[6]

11   18.    Forbes also commented on the elite riches and lifestyle enjoyed by the
12   Fisher family:

> ***Despite the stock's precipitous decline, they all remain billionaires. Doris, who also has a $1 billion art collection and significant cash and investments, is worth an estimated $2.4 billion. John, majority owner of the Oakland Athletics baseball team, is worth $2.5 billion. Bill and Bob both have fortunes of $1.2 billion.***

> All three of the Fisher brothers attended Princeton University and went on to study at Stanford University's School of Business.[7]

///

///

---

[6] *See* Taylor Nicole Rogers, "*The Billionaire Who Cofounded Gap and Her 3 Sons Have Lost $1 Billion in 2019 So Far Amid Sales Slump,*" BUSINESS INSIDER, Nov. 13, 2019, available at https://www.businessinsider.com/gap-billionaires-personal-fortune-drop-sales-slump-2019-11, last visited July 30, 2019.

[7] *See* Lauren Debter, "*The Family Behind Gap Has Lost $1 Billion This Year As Stock Has Plummeted,*" FORBES, Nov. 11, 2019.

SHAREHOLDER DERIVATIVE COMPLAINT



Gap cofounder Doris Fisher (center) attends a gala at the Metropolitan Museum of Art in May 2010 with her sons, Bob Fisher (left) and Bill Fisher (right). BILLY FARRELL/Patrick McMullan via Getty Images

19.     The Fisher family, which controls 43% of the Company's stock and three Board seats, owes fiduciary duties as controlling shareholders of Gap.  As such, they owe heightened duties to shareholders to ensure that they do not personally benefit at the expense of the Company's shareholders or employees.  As set forth herein, they have breached their fiduciary duties by siphoning off billions of dollars for themselves while failing to ensure diversity at the top of the Company and failing to ensure equal opportunities for Black and other minority workers at the Company.  They have compounded the wrongdoing by causing the Company to make misrepresentations in the Company's proxy statements about the Company's alleged commitment to diversity and inclusion.

20.     As set forth below, Defendants' conduct constitutes bad faith and disloyal acts, giving rise to claims that fall outside the scope of the business judgment rule and outside of permissible indemnification by Gap.  As a result, all members of the Board face a substantial likelihood of liability and any demand on them to bring this case would be a futile and useless act.

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

### III.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

22.    This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.    This Court has jurisdiction over Defendants.  Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.  Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.  The Court has jurisdiction over Gap because the Company is headquartered in San Francisco, California at 2 Folsom Street, and has substantial business operations in California.

24.    Venue is proper in this District pursuant to Section 27 of the Exchange Act. Venue is also proper under 28 U.S.C. § 1391(b) because: (a) Gap maintains its principal place of business in this District; and (b) many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

IV.     INTRADISTRICT ASSIGNMENT

25.     In compliance with Local Rule 3-2(d), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Francisco.

V.      THE PARTIES

A.      Plaintiff

26.     Plaintiff Noelle Lee is a current shareholder of Gap, and has continuously held Gap stock at all relevant times.  Plaintiff is a citizen of Canada.

B.      Nominal Defendant

27.     Gap, an American clothing retailer, is a Delaware corporation with its headquarters at Two Folsom Street, San Francisco, California 94105.

C.      Officer Defendants

28.     Defendant Robert J. Fisher has served as non-executive chairman of Gap and served as interim CEO in 2019 when prior CEO Art Peck resigned. Fisher's parents founded and launched Gap over 50 years ago.  Robert J. Fisher was a member of the Gap Board during all relevant times.  Fisher is the Chair of the Governance and Sustainability Committee.  He is managing director of Pisces, Inc. and previously served as interim chief executive officer of Pisces, Inc.

29.     Defendant Sonia Syngal has served as Chief Executive Officer of Gap since 2020 and as a member of the Company's Board since 2004. She previously served as managing director of the Company's Europe operations as well as senior vice president for Gap's International division and International Outlet division.  Syngal was a member of the Gap Board during all relevant times.

30.     Defendant Arthur Peck was the President and Chief Executive Officer of Gap Inc. from February 2015 until November 2019, and was President, Growth, Innovation and Digital division of Gap Inc., from November 2012 to January 2015; President, Gap North America, February 2011 to November 2012; Executive Vice

13

President of Strategy and Operations of Gap Inc., from May 2005 to February 2011; President, Gap Inc. Outlet, October 2008 to February 2011; Acting President, Gap Inc. Outlet, February 2008 to October 2008; and Senior Vice President of The Boston Consulting Group, a business consulting firm, 1982 to 2005.  Peck was a member of the Gap Board during all relevant times.

**D.    Director Defendants**

31.    Defendant Amy Bohutinsky was a member of the Gap Board during all relevant times. Bohutinsky has served as a Director since 2018.  Bohutinsky is a member of the Audit and Finance Committee.  She is the former COO of Zillow Group, Inc. and is currently a director at Zillow Group, Inc.

32.    Defendant Amy Miles was a member of the Gap Board during all relevant times.  Miles is a member of the Audit and Finance Committee.  She is the former Chairman and Chief Executive Officer of Regal Entertainment Group.  Miles is also a director of Norfolk Southern Corporation.

33.    Defendant Isabella D. Goren was a member of the Gap Board during all relevant times.  Goren is Chair of the Audit and Finance Committee.  She is a director of Lyondell Basell Industries N.V. and Mass Mutual Financial Group.  She previously served as Chief Financial Officer of AMR Corporation and American Airlines, Inc.

34.    Defendant Bob L. Martin was a member of the Gap Board during all relevant times. Martin has served as Executive Chairman since March 2020.  Martin is principal of Mcon Management Services, Ltd.   He serves as operating partner of The Stephens Group, LLC and as a director of Conn's, Inc.  He previously held the position of President and Chief Executive Officer at Walmart International.

35.    Defendant Chris O'Neill was a member of the Gap Board during all relevant times.  He is a member of the Compensation and Management Development Committee.  O'Neill is a partner at Portag3 Ventures.

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

36.     Defendant Elizabeth A. Smith is a member of the Gap Board.  She is a member of the Compensation and Management Development Committee.   Smith formerly served as Chairman and Chief Executive Officer of Bloomin' Brands, Inc. Smith is a director of Bloomin' Brands, Inc. and Hilton Worldwide Inc.

37.     Defendant John J. Fisher was a member of the Gap Board during all relevant times.  Fisher is executive vice president of Pisces, Inc.

38.     Defendant Jorge P. Montoya was a member of the Gap Board during all relevant times.    Montoya is a member of the Compensation and Management Development Committee.  He formerly served as an executive of The Procter & Gamble Company.

39.     Defendant Mayo A. Shattuck III was a member of the Gap Board during all relevant times.    Shattuck is a member of the Audit and Finance Committee and Governance and Sustainability Committee.   He is non-executive chairman of Exelon Corporation and serves as a director of Capital One Financial Corporation and Alarm.com.

40.     Defendant Tracy Gardner was a member of the Gap Board during all relevant times.  Gardner is Chair of the Compensation and Management Development Committee and is a member of the Governance and Sustainability Committee.  She is principal of Tracy Gardner Consultancy.  She previously served as chief executive officer of Delia's Inc. and J. Crew Group, Inc.

41.     Defendant William S. Fisher was a member of the Gap Board during all relevant times. Fisher is the founder of Manzanita Capital Limited and previously served as an executive.   He is executive vice chairman of Pisces, Inc.

42.     Defendant Doris F. Fisher was a member of the Gap Board during all relevant times.  She co-founded Gap with her husband, Donald G. Fisher, and serves as Honorary Lifetime Director.

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

43.     Defendants Syngal, Robert Fisher, and Peck are referred to herein as the "Officer Defendants."   The defendants identified in paragraphs 31 through 42 are referred to herein as the "Director Defendants."   Collectively, all defendants are referred to herein as the "Individual Defendants."

### E.     Doe Defendants

44.     Except as described herein, Plaintiff is ignorant of the true names of defendants sued as Does 1 through 30, inclusive, and therefore, Plaintiff sues these defendants by such fictitious names.   Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.   These fictitiously named defendants are Gap officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein.   These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

### F.     Unnamed Participants

45.     Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.   The individuals and entities acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit defendants and themselves to the detriment of Gap.

/ / /

/ / /

/ / /

16

## VI.   RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Responsibilities of the Individual Defendants

46.     Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.

47.     Board Members and Executive Officers are held to the highest level of ethics and compliance with the law.

48.     The Company's Corporate Governance Guidelines state that "Each board member is expected to act with integrity and to adhere to the policies applicable to directors in the Company's ethics code, the Code of Business Conduct. Any waiver of the requirements of the Code of Business Conduct for any individual director would require approval by the Audit and Finance Committee. Any such waiver would be publicly disclosed."

49.     The Company's Corporate Governance Guidelines state:

The board is responsible for oversight of the business, affairs and integrity of the company, determination of the company's mission, long-term strategy and objectives, and oversight of the company's risks while evaluating and directing implementation of company controls and procedures.

50.     The Director Defendants have also publicly stated that the Company considers racial and ethnic diversity as considerations when nominating individuals to serve on the Gap Board:

**Qualifications and Diversity of Board Members**. All board members shall possess certain core competencies, some of which may include experience in retail, consumer products, international business/markets, real estate, store operations, logistics, product design, merchandising, marketing, general operations, strategy, human resources, technology, media or public relations, finance or accounting, or experience as a CEO or CFO. In addition to having one or more of these core competencies, *board member nominees are identified and considered on the basis of knowledge, experience, integrity, leadership, reputation, and ability to understand the company's business. The board believes that diversity, including*

17

SHAREHOLDER DERIVATIVE COMPLAINT

*differences in backgrounds, qualifications, experiences, and personal characteristics, including gender and ethnicity/race, is important to the effectiveness of the board's oversight of the company*. Nominees are pre-screened to ensure each candidate has qualifications which complement the overall core competencies of the board. The screening process includes conducting a background evaluation and an independence determination.[8]

51.     The Board is responsible for oversight and compliance with the Company's internal controls regarding diversity, anti-discrimination, pay equity, hiring and promotion.  As alleged herein, the Company's Board failed to act in good faith by failing to ensure compliance with these policies and controls, which existed on paper, but were knowingly disregarded.

52.     The Individual Defendants have known that, for years, the Company has lacked diversity on the Board and among senior management, and that Black employees and other minorities were conspicuously underrepresented at the Company's headquarters.  Despite this knowledge, the Board has failed to take sufficient corrective action.

53.     The Board also obviously knew that it was all-white and lacked diversity. The Board and the Executive Officers also knew that diversity was lacking in the Company's workforce.

54.     The Board knew the Company had policies in place on paper, but they failed to give the policies any teeth or enforcement.  The Board's conduct represented hypocrisy, bad faith, and disloyal conduct.  The Board had a duty to cause the Company to comply with the law and its own Code of Ethics and Business Conduct, and failed to

---

[8]*See* Gap's Corporate Governance Guidelines, available at https://www.gapinc.com/CMSPages/GetAzureFile.aspx?path=~\gapcorporatesite\media\images\docs\corporate-governance-guidelines.pdf&hash=78a71f377bc1f82e1a6f01eb728cb6bc7355b07f5a1c019107c022b79605f454.

SHAREHOLDER DERIVATIVE COMPLAINT

1  do so.

2      55.    The direct involvement of Gap's Board makes them interested in the

3  outcome of this litigation because they face a substantial likelihood of liability.  Demand

4  is thus futile.

5      **B.**    **Fiduciary Duties of the Individual Defendants**

6      56.    By reason of their positions as officers and directors of the Company, each

7  of the Individual Defendants owed and continue to owe Gap and its shareholders

8  fiduciary obligations of trust, loyalty, good faith, and due care, and were and are

9  required to use their utmost ability to control and manage Gap in a fair, just, honest, and

10  equitable manner.  The Individual Defendants were and are required to act in

11  furtherance of the best interests of Gap and not in furtherance of their personal interest

12  or benefit.

13      57.    To discharge their duties, the officers and directors of the Company were

14  required to exercise reasonable and prudent supervision over the management, policies,

15  practices, and controls of the affairs of the Company.  By virtue of such duties, the

16  officers and directors of Gap were required to, among other things:

17      (a)    conduct the affairs of the Company in an efficient, business-like

18  manner in compliance with all applicable laws, rules, and regulations so as to

19  make it possible to provide the highest quality performance of its business, to

20  avoid wasting the Company's assets, and to maximize the value of the

21  Company's stock; and

22      (b)    remain informed as to how Gap conducted its operations, and, upon

23  receipt of notice or information of imprudent or unsound conditions or practices,

24  make reasonable inquiry in connection therewith, and take steps to correct such

25  conditions or practices and make such disclosures as necessary to comply with

26  applicable laws.

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

### C.   Breaches of Fiduciary Duties by the Individual Defendants

58.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Gap, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

59.   The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to cover up Gap's discrimination, and caused Gap to incur substantial damage.

60.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of Gap, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions.   As a result, and in addition to the damage the Company has already incurred, Gap has expended, and will continue to expend, significant sums of money.

### D.   Conspiracy, Aiding and Abetting, and Concerted Action

61.   At all relevant times, the Individual Defendants were agents of the remaining Individual Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency.   The Individual Defendants ratified and/or authorized the wrongful acts of each of the other Individual Defendants.   The Individual Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

62.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their

SHAREHOLDER DERIVATIVE COMPLAINT

respective duties.

63.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, by failing to maintain adequate internal controls at the Company and covering up discrimination at the Company.

64.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did circumvent the internal controls at the Company and cause the Company to cover up Gap executives' discrimination.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

65.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and waste of corporate assets, and to conceal adverse information concerning the Company's operations.

66.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by intentionally circumventing internal controls at the Company and causing the Company to cover up discrimination at the Company.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall

SHAREHOLDER DERIVATIVE COMPLAINT

1   contribution to and furtherance of the wrongdoing.

2   **VII.**    **SUBSTANTIVE ALLEGATIONS**

3       68.    Gap's Board is one of only a handful of publicly-traded companies in the

4   United States with zero Black members.

5       69.    The lack of diversity at the top at Gap is significant.  The Board bears

6   ultimate responsibility for ensuring the Company's compliance with federal and state

7   laws prohibiting discrimination based on race, gender, and other factors.  Diversity in

8   the workforce is a strong indication of a lack of discrimination; conversely, a lack of

9   diversity provides a strong indication that discrimination is present.

10       **A.**    **Gap's CEO and Key Executive Team**

11       70.    At Gap, not only does the Board lack a single Black member, but the

12   Company's executive ranks also lack a single Black person: Gap's Chief Executive

13   Officer is Sonia Syngal. Gap's key executives include Sonia Syngal and nine others.

14

15

16

17

| **Sonia Syngal**<br>Chief Executive Officer | **Katrina O'Connell**<br>Chief Financial Officer | **Mark Breitbard**<br>Head of Gap Inc. Specialty Brands, Franchise and Asia Pacific |
|---|---|---|
|  |  |  |

18

19

20

21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

**Nancy Green**
Head of Old Navy (Interim)



**Mary Beth Laughton**
Head of Athleta and Hill City



**Julie Gruber**
Chief Legal and Compliance Officer Inc.



**Shawn Curran**
Head of Operations, Gap Inc.



**John Strain**
Head of e-Commerce and Technology, Gap Inc.

**Sally Gilligan**
Head of Information and Strategy, Gap Inc.



**Sheila Peters**
Head of People and Culture, Gap Inc.



23

SHAREHOLDER DERIVATIVE COMPLAINT

1

2    **B.    At All Relevant Times, the Individual Defendants Have Had Actual
3    Knowledge that Gap Has Failed to Comply with Its Own Policies of
     Promoting Diversity and Prohibiting Discrimination, Yet the Individual
4    Defendants Have Continued to Refuse to Nominate Black Individuals
     and Minorities to the Board**

5        71.    Gap has consistently refused to appoint Black individuals and minorities to

6    its Board and to management positions within the Company, and has discriminated

7    against African Americans with respect to hiring and promotion, especially with regard

8    to senior leadership positions.

9        72.    In 2003, Gap agreed to pay more than $500,000 to settle a class-action

10   lawsuit involving allegations of racial discrimination against African American workers

11   at its distribution warehouse in Gallatin, Tennessee.  "We are pleased to have reached an

12   amicable agreement that provides a satisfactory resolution for everyone involved," Gap

13   spokesman Alan Marks said at the time.

14       73.    The lawsuit, which had been filed in 1999, included charges that Gap

15   created a hostile work environment for African American workers and engaged in

16   discriminatory selection and promotion practices. Gap has denied the allegations.

17       74.    Moreover, because Gap maintains specific statistics on its workforce, the

18   Director Defendants have known at all relevant times that the Gap has discriminated

19   against African Americans and minorities by predominantly hiring them for low-level

20   and low-paying jobs in the Company's distribution and call centers.  The percentage of

21   African American workers in such jobs, compared to higher paying jobs in the

22   Company's headquarters, is demonstrated by the following chart:

23

24   / / /

25   / / /

26   / / /

27   / / /

28
                                         24
SHAREHOLDER DERIVATIVE COMPLAINT

Diversity of U.S. Employees

75.     Moreover, while the Gap discloses certain information regarding the salaries of men and women for similar jobs (*i.e.*, "Gender Pay Equity"), Gap has failed to disclose similar information regarding the salaries and compensation of minorities at the Company.  Upon information and belief, minorities at Gap are paid less than whites.

76.     The racial pay gap is well-documented and persistent. According to data from the Economic Policy Institute, Black workers "have been losing ground since 2000, with larger [B]lack-white wage gaps across the entire distribution of earnings."[9] For example, Black wages at the median in 2019 were only 75.6 percent of white wages, a 3.6 percent increase from 2000, when Black wages at the median were 79.2 percent of white wages.[10] Even when looking at wages by education level, Blacks are paid less than whites. Blacks with advanced degrees are paid 82.4 cents for each dollar earned by

---

[9]  *See* Elise Gould, "*State of Working America Wages 2019*," ECONOMIC POLICY INSTITUTE, Feb. 20, 2020, available at https://www.epi.org/publication/swa-wages-2019/, last visited August 4, 2020.

[10] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

whites with an advanced degree.

## On average, white workers are paid more than black and Hispanic workers at nearly every education level

Average hourly wages, by race/ethnicity and education, 2019



| | White | Hispanic | Black |
|---|---|---|---|
| Less than high school | $13.88 | $14.60 (105.1%) | $12.40 (89.3%) |
| High school | $20.04 | $17.88 (89.2%) | $16.37 (81.7%) |
| Some college | $22.26 | $19.23 (86.4%) | $17.86 (80.2%) |
| College | $35.90 | $30.35 (84.5%) | $27.81 (77.5%) |
| Advanced degree | $45.29 | $40.80 (90.1%) | $37.33 (82.4%) |

Chart   Data

**Source:** Author's analysis of EPI Current Population Survey Extracts, Version 1.0 (2020),
https://microdata.epi.org

Economic Policy Institute

77.     The practice of asking job applicants for their salary history has also perpetuated lower compensation for Blacks and minorities.

26

78.     In 2016, Massachusetts enacted the first ban, preventing employers from asking job candidates about their salary history. Since then 18 other states, as well as many cities, have implemented salary history bans.[11] The goal of these bans is to prevent initial wage disparities from multiplying as individuals move from one job to another. "Employers should be hiring and paying potential employees for the experience and qualifications they have," said New Jersey Senator Loretta Weinberg in discussing the law that New Jersey enacted. "Knowing how much they were paid in the past is irrelevant and often times leads to a cycle of pay inequity. By eliminating inquiries of salary history, we can help curb wage discrimination based not only on gender, but also race, age and other characteristics," Weinberg added.

79.     While each state's bill is slightly different in terms of the scope of employers covered and the explicit intent, the overall goal is to prevent employers from anchoring salary offers on previous salaries and unintentionally perpetuating the wage gap.

80.     In a recently released working paper, researchers at Boston University found that, following the implementation of salary history bans (SHB), pay for job switchers increased by 5 percent more than for comparable job changers.[12] Moreover, they found even larger benefits for Black and female job switchers, who saw pay increases of 13 percent and 8 percent, respectively. "Salary histories appear to account for much of the persistence of residual wage gaps," the authors note. "For women and African-Americans, the pay increases following an SHB represent a sizeable portion of the residual wage gap measured for job-changing employees, suggesting that most of

---

[11] *See* Shahar Ziv, "*Salary History Bans Reduce Racial and Gender Wage Gaps; Every CEO Should Use Them,*" Forbes, June 23, 2020.

[12] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

1    this gap is not related to productivity differences between workers.[13]

2        81.    The study's authors note that wage gaps may not be caused by individual

3    and overt discrimination, but that "salary histories enable a form of institutional

4    discrimination. Even if employers do not individually discriminate, the use of salary

5    histories appears to perpetuate the effects of past discrimination or other group

6    inequities."[14]

7        C.    **Background of Additional Disclosures Mandated by the SEC in Proxy
          Statements Relating to the Process by Which Individuals Are Nominated
8         to the Boards of Directors of Publicly-Traded Companies**

9        82.    In 2008-2009, the stock market plunged by over 50% due to mortgage-

10   related fraud.  The Dow Jones Industrial Average ("DJIA") hit a market low of 6,469.95

11   on March 6, 2009, having lost over 54% of its value since the October 9, 2007 high.  In the

12   ensuing years, the United States suffered a massive recession.  Many corporations such

13   as Countrywide, Lehman Brothers, Merrill Lynch, Fannie Mae, Freddie Mac, and

14   American International Group collapsed or had to be rescued by the government due to

15   fraud or exposure to the subprime mortgage market.  But for a massive governmental

16   intervention to save companies and inject unprecedented liquidity into the market,

17   many commentators at the time believe another great depression would have ensued.

18       83.    But before the 2008-2009 stock market crash, another major stock market

19   crash had occurred in 2001-2002.  Between 1995 and its peak in March 2000, the Nasdaq

20   Composite stock market index rose 400%, only to fall 78% from its peak by October 2002,

21   giving up all its gains during the bubble. During the "dot.com" crash, many online

22   shopping companies, such as Pets.com, Webvan, and Boo.com, as well as several

23   communication companies, such as Worldcom, NorthPoint Communications, and

24   _____

25       [13] *Id.*

       [14] *Id.*
26

27

28
                                              28

SHAREHOLDER DERIVATIVE COMPLAINT

1   Global Crossing, failed and shut down.  Some companies, such as Cisco, whose stock

2   declined by 86%, and Qualcomm, lost a large portion of their market capitalization but

3   survived.  The "Internet bubble" that preceded the crash was fueled by speculation on

4   new Internet companies and by widespread but temporary abandonment by Wall Street

5   and analysts of "traditional" and allegedly "outdated" analytic tools such as price

6   earnings ratios, which supposedly were irrelevant to the new-fangled dot.com

7   companies, (which of course had no profits, such that ignoring price earnings ratios

8   proved convenient for the analysts touting the companies and the investment banks

9   seeking to profit from bringing the companies public).  At the time, there was also a

10  widespread lack of any type of "Chinese wall" between the underwriting and analyst

11  departments at major Wall Street firms.  Securities analysts at brokerage firms were

12  frequently influenced by their partners at the firm who were making much more money

13  from the underwriting business and who thus did not want to "alienate" their clients by

14  having their colleagues write negative analyst reports.

15      84.    When the dot.com bubble burst, it had a major negative effect on the

16  economy and the value of Americans' pension funds, retirement accounts, and

17  investment savings.  In light of these devastating effects, Congress and the SEC passed

18  major legislation to try to provide additional protection to investors.

19      85.    The Sarbanes–Oxley Act of 2002 (Pub.L. 107–204, 116 Stat. 745, enacted July

20  30, 2002), also known as the "Public Company Accounting Reform and Investor

21  Protection Act" (in the Senate) and "Corporate and Auditing Accountability,

22  Responsibility, and Transparency Act" (in the House) and more commonly called

23  Sarbanes–Oxley or SOX, established new or expanded requirements for all U.S. public

24  company boards, management and public accounting firms. A number of provisions of

25  the Act also apply to privately held companies, such as the willful destruction of

26  evidence to impede a federal investigation.  The bill was enacted to protect investors in

27  light of massive fraud at a number of companies, including Enron and WorldCom.

28

SHAREHOLDER DERIVATIVE COMPLAINT

86.     Due to Congressional recognition that a company's Board of Directors and senior management should bear ultimate responsibility for wrongdoing, the Sarbanes-Oxley Act added responsibilities to a public corporation's board of directors, added criminal penalties for certain misconduct, and required the SEC to create regulations to define how public corporations are to comply with the law.  In addition, it added a requirement that a company's CEO and CFO certify a company's financial results in Form 10-Ks and 10-Qs.

87.     In 2003, the SEC passed a final rule aimed at providing shareholders with additional disclosures in companies' proxy statements regarding the persons nominated to serve on Boards of Directors and the process by which they are nominated.  The final rule was entitled "Disclosure Regarding Nominating Committee Functions and Communications Between Security Holders and Boards of Directors."  *See* 17 CFR Parts 228, 229, 240, 249, 270 and 274 [Release Nos. 33-8340; 34-48825; IC-26262; File No. S7-14-03].

88.     In explaining the need for the rule, the SEC stated:

The amendments are designed to address the growing concern among security holders over the accountability of corporate directors and the lack of sufficient security holder input into decisions made by the boards of directors of the companies in which they invest. Currently, companies must state whether they have a nominating committee and, if so, must identify the members of the nominating committee, state the number of committee meetings held, and briefly describe the functions performed by such committees.  In addition, if a company has a nominating or similar committee, it must state whether the committee considers nominees recommended by security holders and, if so, must describe how security holders may submit recommended nominees.   The amendments are designed to build upon existing disclosure requirements to elicit a more detailed discussion of the policies and procedures of nominating committees as well as the means by which security holders can communicate with boards of directors.

89.     Six years later, and after the 2008-2009 stock market crash, the SEC passed

SHAREHOLDER DERIVATIVE COMPLAINT

another set of rules mandating additional proxy disclosures regarding the board nomination process.  At an open meeting held on December 16, 2009, the SEC approved a set of proposed rules to enhance the information provided to shareholders in company proxy statements regarding a number of risk oversight, compensation, board leadership and composition and other corporate governance matters.  The SEC released the text of the final rules on the same date they were adopted.

90.     The final rules were proposed in July 2009.  However, based on the more than 130 comment letters that the SEC received on the proposals, the final rules reflect a number of changes that result in clearer and more precisely defined, but in some cases broader, disclosure standards than what the SEC had initially proposed.  Among the more significant changes from the rule proposals are the following:

**Director qualifications**.  The final rules require disclosure concerning the specific experience, qualifications, attributes or skills of directors and director nominees that led to the conclusion that the person should serve as a director.  The proposed rules would have required this disclosure to, in addition, address how these factors related to directors' service on board committees.

**Compensation Practices and Risk Management**.  The proposed rules would have required disclosure in the Compensation Discussion and Analysis of any compensation policies and compensation practices applicable to employees (whether or not they are executive officers) if they created risks that "may have a material effect" on the company.  The final rule requires disclosure of employee compensation policies and practices that create risks only if they "are reasonably likely to have a material adverse effect on the company."  Further, pursuant to the final rule, this disclosure will not be part of the Compensation Discussion and Analysis, but instead will be a new and separate disclosure requirement.

**Diversity Considerations in the Director Nomination Process**.  In the rule proposals, the SEC asked whether it should amend its rules to require disclosure of additional factors that a nominating committee considers when selecting someone for a position on the board, such as diversity, and whether it should amend the rules to require additional or different

31

SHAREHOLDER DERIVATIVE COMPLAINT

disclosure related to board diversity.  *The rules as adopted require disclosure of whether, and if so how, a nominating committee considers diversity in identifying nominees for directors.  Moreover, in what may be a regulatory first for disclosure of the inner workings of a board, if a nominating committee has a policy with regard to consideration of diversity, the rules require disclosure of how the policy is implemented, as well as how the nominating committee assesses the effectiveness of the policy.*[15]

91.     As this brief history demonstrates, in the wake of the two major stock market crashes of this century, Congress and the SEC passed important laws requiring significant additional responsibilities and disclosures by corporate boards.

92.     These additional Board-level responsibilities and potential criminal liability were needed because of the devastating effect corporate fraud has on the livelihood and retirement savings of Americans.

93.     The additional disclosures required in proxy statements regarding the qualifications and nominating process of persons nominated to serve on Boards of Directors were necessary because, as the ultimate decision-making body of a company, the Board bears ultimate responsibility for corporate decisions.  Congress and the SEC rightfully determined that shareholders needed additional information about the qualifications of director nominees and the process by which a company's nominating and corporate governance committee identifies and selects persons to serve on corporate boards.

94.     And beginning in 2009, additional specific disclosures were mandated requiring "disclosure of additional factors that a nominating committee considers when selecting someone for a position on the board, such as diversity, and whether it should

---

[15] *See* "SEC Adopts Final Rules on Enhanced Proxy Statement Disclosures," Harvard Law School Forum on Corporate Governance, Dec. 21, 2009, available at https://corpgov.law.harvard.edu/2009/12/21/sec-adopts-final-rules-on-enhanced-proxy-statement-disclosures/, last visited July 24, 2020.

32

SHAREHOLDER DERIVATIVE COMPLAINT

1    amend the rules to require additional or different disclosure related to board diversity.

2    *The rules as adopted require disclosure of whether, and if so how, a nominating*

3    *committee considers diversity in identifying nominees for directors."*

4         95.     In passing the 2009 rule, the SEC stated:

5
6         In the Proposing Release, we also requested comment on whether we
     should amend our rules to require disclosure of additional factors
7    considered by a nominating committee when selecting someone for a
     board position, such as board diversity. A significant number of
8    commenters responded that disclosure about board diversity was
     important information to investors.[16] Many of these commenters believed
9    that requiring this disclosure would provide investors with information on
10   corporate culture and governance practices that would enable investors to
     make more informed voting and investment decisions.[17] Commenters also
11   noted that there appears to be a meaningful relationship between diverse
     boards and improved corporate financial performance, and that diverse
12   boards can help companies more effectively recruit talent and retain staff.[18]
13

14        *We agree that it is useful for investors to understand how the board*
15   *considers and addresses diversity, as well as the board's assessment of the*
     *implementation of its diversity policy, if any. Consequently, we are*
16   *adopting amendments to Item 407(c) of Regulation S-K to require*
17   *disclosure of whether, and if so how, a nominating committee considers*

18

19   _____

20       [16] *See, e.g.,* letters from Board of Directors Network, Boston Common Asset
     Management, CalPERS, CalSTRS, Calvert, Council of Urban Professionals, Ernst &
21   Young LLP ("E&Y"), Greenlining Institute, Hispanic Association on Corporate
     Responsibility, Interfaith Center on Corporate Responsibility, InterOrganization
22   Network, Latino Business Chamber of Greater Los Angeles, Pax World Management
     Corporation, Prout Group, Inc., RiskMetrics, Sisters of Charity BVM, Sisters of St. Joseph
23   Carondelet, and Trillium Asset Management Corporation.

24       [17] *See, e.g.,* letters from the Boston Club, Boston Common Asset Management,
     CalPERS, Pax World Management Corporation, Trillium Asset Management
     Corporation, and Social Investment Forum.

25       [18] *See, e.g.,* letters from Catalyst and the Social Investment Forum.

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

*diversity in identifying nominees for director*.[19] In addition, if the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees, disclosure would be required of how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[20]

96.     In further expanding on the importance and materiality to investors of the new diversity disclosures mandated by the 2009 rule, the SEC stated:

Required disclosure of whether, and if so, how a nominating committee (or the board) considers diversity in connection with identifying and evaluating persons for consideration as nominees for a position on the board of directors may also benefit investors. *Board diversity policy is an important factor in the voting decisions of some investors.[21] Such investors will directly benefit from diversity policy disclosure* to the extent the policy and the manner in which it is implemented is not otherwise clear from observing past and current board selections.     Although the amendments are not intended to steer behavior, *diversity policy disclosure may also induce beneficial changes in board composition*. A board may determine, in connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity. Such a policy may encourage boards to conduct broader director searches, evaluating a wider range of candidates and potentially improving board quality. *To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent. To the extent that a more independent board is desirable at a particular company,*

---

[19] *See* Item 407(c)(2)(vi) of Regulation S-K. Funds will be subject to the diversity disclosure requirement of Item 407(c)(2)(vi) of Regulation S-K under Item 22(b)(15)(ii)(A) of Schedule 14A. *See* 17 CFR 240.14a-101, Item 22(b)(15)(ii)(A).

[20] *See* United States Securities & Exchange Commission, Release Nos. 33-9089; 34-61175; IC-29092; File No. S7-13-09, Dec. 16, 2009, available at https://www.sec.gov/rules/final/2009/33-9089.pdf, last visited July 25, 2020.

[21] *See, e.g.,* letters from Calvert, Trillium, Boston Common Asset Management, CII, Florida State Board of Administration, and Sisters of Charity BVM. *See also* letter from Lissa Lamkin Broome and Thomas Lee Hazen.

SHAREHOLDER DERIVATIVE COMPLAINT

*the resulting increase in board independence could potentially improve governance*.  In addition, in some companies a policy of increasing board diversity may also improve the board's decision making process by encouraging consideration of a broader range of views.[22]

97.    As a result of the 2009 rule enacted by the SEC, Item 407 of Regulation S-K now requires all companies in their proxy statements to:

> Describe the nominating committee's process for identifying and evaluating nominees for director, including nominees recommended by security holders, and any differences in the manner in which the nominating committee evaluates nominees for director based on whether the nominee is recommended by a security holder, and whether, and if so how, the nominating committee (or the board) considers diversity in identifying nominees for director. If the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees, describe how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of its policy.[23]

98.    As set forth herein, Gap has not complied with these requirements in its Proxy Statements and thus has denied its shareholders key, material information about how the Company's nominating and governance committee considers diversity in identifying nominees for directors.

D.    **False and Misleading Statements Made by the Director Defendants in Gap's 2019 & 2020 Proxy Statements**

99.    The Director Defendants have caused Gap to consistently make false statements about Gap's consideration of diversity in the Board nomination process and its commitment to diversity and the promotion of Blacks and other minority employees to positions of management and power at Gap.  The 2019 Proxy was filed with the SEC on April 9, 2019 and approved by Directors John J. Fisher, Amy Bohutinsky, Robert J.

---

[22] *Id.*

[23] *See* Item 407(c)(2)(vi) of Regulation S-K, 17 CFR §229.407.

SHAREHOLDER DERIVATIVE COMPLAINT

1 Fisher, William S. Fisher, Tracy Gardner, Isabella Goren, Bob Martin, Jorge Montoya,

2 Chris O'Neill, Arthur Peck, Lexi Reese, and Mayo Shattuck.

3     100.    Gap's 2020 Proxy Statement was filed with the SEC on April 7, 2020 and

4 approved by Directors John J. Fisher, Amy Bohutinsky, Robert J. Fisher, William S.

5 Fisher, Tracy Gardner, Isabella Goren, Bob Martin, Amy Miles, Jorge Montoya, Chris

6 O'Neill, Mayo Shattuck, Elizabeth A. Smith, and Sonia Syngal.

7     101.    In the 2019 and 2020 Proxy Statements, the Directors included the

8 following identical representation that the Board was qualified in part due to its

9 diversity and efforts to actively consider diversity in choosing Board nominees:

10 **Qualifications and Diversity of Board Members**

11 All director nominees must possess certain core competencies, some of
12 which include experience in retail, consumer products, international
13 business/markets, real estate, store operations, logistics, product design,
14 merchandising, marketing, general operations, strategy, human resources,
15 technology, media or public relations, finance or accounting, or experience
as a CEO or CFO. In addition to having one or more of these core
competencies, ***director nominees are identified and considered based on***
16 ***knowledge, experience, integrity, leadership, reputation, background,***
17 ***viewpoint, qualifications, gender, race/ethnicity, personal characteristics,***
and ability to understand the Company's business, as well as their
18 integrity, inclination to engage and intellectual approach. The Board
19 believes that varying tenures and backgrounds create a balance between
20 directors with a deeper knowledge of the Company's business, operations
and history, and directors who bring new and fresh perspectives, and that
21 this overall tenure, professional, personal, gender, and racial/ethnic
22 diversity is important to the effectiveness of the Board's oversight of the
Company. Accordingly, diversity is a factor that is considered in the
23 identification and recommendation of potential director candidates. In this
regard, of the twelve nominees for director, four are women and one is
24 ethnically diverse. In addition, all director nominees are pre-screened to
25 ensure that each candidate has qualifications and experience that
complement the overall core competencies of the Board. The screening
26 process also includes conducting a background evaluation and an
27 independence determination. ***The Board believes that its criteria for***
***selecting board nominees are effective in promoting overall diversity***.

28

SHAREHOLDER DERIVATIVE COMPLAINT

102.   The 2019 and 2020 Proxy Statements also stated:

**EVALUATION OF DIRECTORS**

The Governance and Sustainability Committee is responsible for overseeing a formal evaluation process to assess the composition and performance of the Board, each committee, and each individual director on an annual basis. The assessment is conducted to identify opportunities for improvement and skill set needs, as well as to ensure that the Board, committees, and individual members have the appropriate blend of diverse experiences and backgrounds, and are effective and productive. As part of the process, each member completes a survey, or participates in an interview or other method the Committee utilizes to seek feedback. While results are aggregated and summarized for discussion purposes, individual responses are not attributed to any individual and are kept confidential to ensure honest and candid feedback is received. The Committee discusses opportunities and makes recommendations for improvement as appropriate to the full Board, which implements agreed upon improvements. The Committee Chair also meets privately with individual Board members to provide feedback specific to each director received during the evaluation process. A director will not be nominated for reelection unless it is affirmatively determined that he or she is substantially contributing to the overall effectiveness of the Board.

103.   The 2019 Proxy stated the following with respect to identification and nomination of individuals to serve on the Board:

**NOMINATION OF DIRECTORS**

The Governance and Sustainability Committee has the responsibility to identify, evaluate, and recommend qualified candidates to the Board. The Chairman, CEO, and at least two independent directors interview any qualified candidates prior to nomination. Other directors and members of management interview each candidate as requested by the Chairman, CEO, or chair of the Committee. Mr. Fisher was identified as a potential candidate by the Board. Ms. Bohutinsky and Ms. Reese were identified as potential candidates by a third-party search firm.

*The Committee identifies desired attributes and experience – classifying those that are prioritized and mandatory versus those that are ideal but not mandatory – and engages third-party search firms as independent consultants to identify potential director nominees based on these criteria and a needs assessment. The*

SHAREHOLDER DERIVATIVE COMPLAINT

Committee, in collaboration with the consultant, may develop targeted search specifications. ***These consultants have assisted the Committee in identifying a diverse pool of qualified candidates*** and in evaluating and pursuing individual candidates at the direction of the Committee.

104.    The 2020 Proxy also stated:

The Governance and Sustainability Committee has the responsibility to identify, evaluate, and recommend qualified candidates to the Board. The Chairman, CEO, and at least two independent directors interview any qualified candidates prior to nomination. Other directors and members of management interview each candidate as requested by the Chairman, CEO, or chair of the Committee. Ms. Miles and Ms. Smith were identified as potential candidates by a third-party search firm.

105.    These statements were false and misleading.  In reality, regardless of whether Gap's Governance and Sustainability Committee during the relevant period (which was comprised of Defendants Robert J. Fisher, Bob Martin, Tracy Gardner, and Mayo Shattuck) ever made any efforts to recruit any Black individuals to the Board, no Black individuals currently serve on the Board.  Actions speak louder than words.  In fact, the Board has never in good faith actively sought African American candidates. The Proxy Statements represented that the Governance and Suitability Committee identified and recruited Board nominees "***based on knowledge, experience, integrity, leadership, reputation, background, viewpoint, qualifications, gender, race/ethnicity, personal characteristics,***" whereas in reality Gap has not actively sought to recruit minorities and has just attempted to create the false impression that it is "committed" to doing so.  This is the very definition of a misleading statement.[24]

106.    The assertions in the 2019 and 2020 Proxy Statements were misleading because Gap does not consider racial and ethnic diversity when choosing Board nominees.

---

[24] In fact, the only Board nominees recruited by Gap for the last four Board positions were all women and no minorities were recruited, considered, or nominated.

SHAREHOLDER DERIVATIVE COMPLAINT

107.     To attempt to justify its failure to break from a *status quo* rooted in systemic discrimination, Gap's Board has resisted efforts to appoint new members to its Board by claiming that the individuals who have served on the Board for, in some cases decades, have experience that is valuable to the Company.   In the Company's 2019 Proxy, the Director Defendants caused Gap to state the following with respect to Robert J. Fisher, who has served on the Board for thirty (30) years:

> Mr. Fisher has vast retail business experience specific to Gap Inc. and its global operations, as a result of his many years serving in a variety of high-level Gap Inc. positions. His previous leadership and oversight roles at the Company provide him with a deep understanding and unique insight into our organizational and operational structure. Mr. Fisher brings strong leadership to the Board based on perspective gained from his management roles and experience as a key member of the founding family and significant shareholder.

108.     This statement was misleading.   In fact, longer-tenured directors do not serve the best interests of the Company, as amply demonstrated by leading academics and professionals in the field of best corporate governance principles. A report by the Harvard Law School Forum on Corporate Governance noted that:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors (one-third of whom each own or manage assets in excess of $100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.[25]

---

[25]   *Available at* https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms/ (last visited June 21, 2020).

SHAREHOLDER DERIVATIVE COMPLAINT

109.   In reality, the Director Defendants' refusal to adopt director term limits and to appoint new Black and minority members to the Board represents explicit or implicit racism at Gap and an improper pretext for failing to add Black and minority individuals to the Board.  In misrepresenting the reason for failing to add new members to its Board (by falsely claiming that adding new persons to the Board would deprive Gap of the "experience" of older white members, including at least three Fisher family members, who have served on the Board for decades), the Director Defendants intentionally or recklessly made false statements in order to get themselves reelected and to conceal the true reasons for Gap's long-standing failure to add Black individuals to its Board.

110.   The 2019 and 2020 Proxy Statements also contained proposals to retain Deloitte & Touche.  The Proxy Statements represented that:

> The Audit and Finance Committee periodically reviews and evaluates the performance of Deloitte & Touche's lead audit partner, oversees the required five-year rotation of the lead audit partner responsible for our audit and, through the Committee's Chair as representative of the Audit and Finance Committee, reviews and considers the selection of the lead audit partner. In addition, the Audit and Finance Committee periodically considers whether there should be a rotation of the independent registered public accounting firm. At this time, the Audit and Finance Committee and the Board believe that the continued retention of Deloitte & Touche to serve as our independent registered public accounting firm is in the best interests of the Company and our shareholders.

111.   Gap's Audit and Finance Committee at the time the Proxy Statements were filed was comprised of Defendants Shattuck, Bohutinsky, Goren, and Gardner.  Their duties, among others, were as follows, as stated in the Proxy:

> This Committee assists the Board of Directors in fulfilling its oversight responsibilities relating to the integrity of our financial statements, adequacy of internal controls, compliance with legal and regulatory requirements, the qualifications and independence of the registered public accounting firm and the performance of its audits, the performance of the Internal Audit function, the effectiveness of the corporate compliance program, finance matters, and such other duties as directed by the Board of

40

Directors. In addition, the Committee is directly responsible for the appointment, compensation, retention and oversight of the independent registered public accounting firm.

112.    The statements in the Proxy about the Audit and Finance Committee's consideration of the need for rotation (*i.e.*, replacement) of Deloitte & Touche were false and misleading.   The Audit & Finance Committee members were well aware that lengthy retention of an auditor by a corporation results in a chummy relationship between auditor and client which is not conducive to effective auditing.

113.    Further, Defendants Shattuck, Bohutinsky, Goren, and Gardner were well aware that Deloitte has served as the Company's auditor since 1976, which is an extremely long time for a publicly-traded company to have the same auditor, without rotation.   The Defendants were also well aware, as alleged herein, that the Board itself lacked any Blacks on the Board and had been unsuccessful in achieving diversity as to ethnicity and race among its executives and leadership positions.   They also knew that it was Deloitte's job to perform tests and analysis to determine whether management was complying with the Company's stated polices and internal controls, and that Deloitte was failing to do so with respect to the Company's stated "mandate" to achieve diversity.   The Director Defendants thus knew that the Company would benefit from a rotation of Deloitte, yet falsely stated in the 2019 and 2020 Proxy Statements that rotation of Deloitte was not advisable and that "the continued retention of Deloitte & Touche to serve as our independent registered public accounting firm is in the best interests of the Company and our shareholders."

114.    Defendants Shattuck, Bohutinsky, Goren, and Gardner, as the members of the Audit and Finance Committee, breached their fiduciary duties by failing to perform their duties on the Audit and Finance Committee, including failure to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity, anti-discrimination, anti-harassment, pay equity, and other relevant areas of critical importance to the Company.   They also signed the 2019 & 2020 Proxy Statements

41

1   that contained false statements regarding the Company's internal controls being
2   effective and adequate, which were false and gave a very misleading and inaccurate
3   portrayal of these key issues to stockholders.

4      115.   The 2019 and 2020 Proxy Statements each contained a report from the
5   Audit & Finance Committee which stated that the Committee had discussed the
6   effectiveness of the Company's internal controls with Deloitte, found the controls to be
7   effective, and approved the filing of the Company's audited financial statements with
8   the SEC.  The 2020 Proxy stated:

> *The Audit and Finance Committee assists the Board of Directors in fulfilling its oversight responsibilities relating to the integrity of the Company's financial statements, the adequacy of internal controls, compliance with legal and regulatory requirements, the qualifications and independence of the independent registered public accounting firm and the performance of its audits, the performance of the Internal Audit function, the effectiveness of the corporate compliance program, finance matters, and such other duties as directed by the Board of Directors*. The Committee operates under a written charter (available at www.gapinc.com, follow the Investors, Governance, Audit and Finance Committee Charter links) adopted by the Board of Directors. The Committee is composed exclusively of directors who are independent under New York Stock Exchange listing standards and Securities and Exchange Commission rules.
>
> The Committee has reviewed and discussed the audited financial statements of the Company for the fiscal year ended February 1, 2020 with the Company's management. In addition, *the Committee has discussed with Deloitte & Touche LLP, the Company's independent registered public accounting firm, the matters required to be discussed by the applicable Public Company Accounting Oversight Board and Securities and Exchange Commission requirements.*
>
> The Committee also has received the communications, including written disclosures and the letter from Deloitte & Touche LLP, required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Committee concerning independence, and the Committee has discussed the independence of Deloitte & Touche LLP with that firm.

SHAREHOLDER DERIVATIVE COMPLAINT

Based on the Committee's review and discussions noted above, the Committee recommended to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended February 1, 2020 for filing with the Securities and Exchange Commission.

Mayo A. Shattuck III (Chair)
Amy Bohutinsky
Tracy Gardner (Committee member until March 2020)
Isabella D. Goren

116.    The following chart represents the fees paid to Deloitte in 2018 and 2019:

**FISCAL YEAR 2019 AND 2018 ACCOUNTING FEES**

| Fees (see notes below) | | Fiscal Year 2019 | | Fiscal Year 2018 |
|---|---|---|---|---|
| Audit Fees | $ | 5,212,200 | $ | 5,185,400 |
| Audit-Related Fees | | 2,065,003 | | 208,521 |
| Tax Fees | | 525,900 | | 941,700 |
| All Other Fees | | 577,042 | | 86,895 |
| Total | $ | 8,380,145 | $ | 6,422,516 |

117.    The 2019 Proxy also contained a "Proposal No. 3: ADVISORY VOTE ON THE OVERALL TOTAL COMPENSATION OF THE GAP, INC.'S NAMED EXECUTIVE OFFICERS" which stated:

Pursuant to Section 951 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Company is providing shareholders with an advisory (non-binding) vote on the overall compensation of our named executive officers. Accordingly, the following resolution will be submitted for a shareholder vote at the 2019 Annual Meeting:

"RESOLVED, that the shareholders of The Gap, Inc. (the "Company") approve, on an advisory basis, the overall compensation of the Company's

43

named executive officers, as described in the Compensation Discussion and Analysis section, the accompanying compensation tables, and the related narrative disclosure pursuant to Item 402 of Regulation S-K, set forth in the Proxy Statement for this Annual Meeting."

The Board and the Compensation and Management Development Committee, which is comprised entirely of independent directors, will consider the outcome of the shareholders' non-binding advisory vote when making future executive compensation decisions.

As described in detail under the section entitled "Compensation Discussion and Analysis," our executive compensation program is designed to provide the level of compensation necessary to attract and retain talented and experienced executives, and to motivate them to achieve short-term and long-term goals, thereby enhancing shareholder value and creating a successful company. We are committed to tie pay to performance and continue to believe our executive compensation program meets each of our compensation objectives.

118.    In support of this Proposal, the 2019 Proxy stated, in part, the following:

**COMPENSATION OBJECTIVES**

Our compensation program is intended to align total compensation for executives with the short and long-term performance of the Company, while enabling us to attract and retain executive talent. Specifically, the program is designed to:

- Support a performance-oriented culture;
- Support our business strategy by motivating and rewarding achievement of short and long-term objectives, as well as individual contributions;
- Attract and retain executive talent;
- Link executive rewards to shareholder returns; and
- Promote a culture of executive stock ownership.

Our program rewards executives for the achievement of corporate and divisional financial and non-financial objectives, for their individual contributions to these results, and for optimizing long-term returns to shareholders. The majority of each executive's total compensation opportunity is weighted toward incentive compensation tied to the financial performance of the Company and aligned to the long-term return to our shareholders. When we do not achieve targeted performance levels and/or our stock

44

SHAREHOLDER DERIVATIVE COMPLAINT

price does not appreciate, compensation that can be realized by our executives is substantially reduced. When we exceed targeted performance levels and/or our stock price appreciates, compensation that can be realized by our executives is substantially increased. We believe that this is the most effective means of aligning executive pay with our shareholders' interests.

**ELEMENTS OF COMPENSATION**

The main elements of our executive compensation program are:

- Base salary;
- Annual cash incentive bonus;
- Long-term incentives; and
- Benefits and limited perquisites.

We have chosen these elements because we believe each supports achievement of one or more of our compensation objectives, and that together they have been and will continue to be effective in this regard. The use and weight of each compensation element is based on the judgment of the Committee regarding the importance of each compensation objective in supporting our business and talent strategies, as well as the structure of these elements for executives at other companies. Base salary, benefits and perquisites represent less than half of each Executive's potential compensation at target performance levels, to emphasize the importance of performance-based compensation.

119.    With respect to the Annual Cash Bonus, the 2019 Proxy stated:

**Fiscal 2018 Annual Bonus**

In setting the fiscal 2018 annual bonus structure, the Committee considered our business and talent priorities, as well as the factors described below under "Compensation Analysis Framework." We determined that there was a continued need to incent achievement of objectives related to our transformation initiatives and balanced growth strategy, in addition to our financial objectives, to successfully position the Company for long-term success. To support this goal, the Committee approved continuation of the existing annual cash incentive structure, which equally emphasizes financial results for the fiscal year and accomplishments related to our operating model transformation and balanced growth strategy. In addition, measurement of objectives related to our operating model transformation and balanced growth strategy were measured at the company level to enhance collaboration across the organization. However, the underlying objectives continue to be a priority for the organization. The table below

45

SHAREHOLDER DERIVATIVE COMPLAINT

describes the target annual bonus and potential payout range for each Executive. The annual incentive bonus was based on two components:

1.  Financial Performance Component. 50% of the total opportunity was based on the financial performance of the Company or a division of the Company (of this, 75% was based on earnings, given the importance of accountability for operating results, and 25% on net sales, to drive top-line focus).

2.  Operating Model Transformation Component. 50% of the total opportunity was based on achievement against the operating model transformation goals of the Company.

120.   With respect to the Financial Performance Component of the Annual Cash Bonus, the Proxy stated:

**Financial Performance Component**
The Committee approves threshold, target and maximum performance goals at the beginning of each performance period. Payouts are made under the financial performance component only if threshold goals are achieved.

Bonuses for fiscal 2018 financial performance were based on earnings before interest and taxes ("earnings"), weighted 75%, and net sales, weighted 25%. Earnings and net sales were used to measure both Company and division performance, in both cases subject to potential adjustment for certain pre-established items that are unusual in nature or infrequently occur. The earnings measure was selected for fiscal 2018 and weighted more heavily because the Committee believed that earnings should continue to be a primary focus of Executives and is a good measure of actual operating performance within their control and accountability. The net sales measure is intended to drive top-line focus and to promote continued market share growth. Measuring both earnings and net sales diversifies performance metrics, and we believe it provides an appropriate balance between cost management and top line performance.

121.   Based on the achievement of the financial performance component, the Company awarded the following cash bonuses to certain executives:

The following table describes the calculation of the actual bonus for fiscal 2018 for each eligible Executive.

SHAREHOLDER DERIVATIVE COMPLAINT

| Name | Base Salary[1] x | Target Percentage of Base Salary x ( | Actual Percentage Achieved: Financial Performance Component [2] x | Weight + | Transformation Component[2] x | Actual Percentage Achieved: Weight) = | Funded Bonus - | Negative Discretion = | Actual Bonus |
|---|---|---|---|---|---|---|---|---|---|
| Art Peck | $ 1,526,439 x | 175% x ( | 9% x | 50% + | 175% x | 50%) = $ | 2,464,193 - $ | 2,464,193 = $ | 0 |
| Teri List-Stoll | $ 918,267 x | 100% x ( | 9% x | 50% + | 175% x | 50%) = $ | 847,084 - $ | 654,152 = | 192,932 |
| Mark Breitbard | $ 949,998 x | 125% x ( | 87% x | 50% + | 175% x | 50%) = $ | 1,556,194 - $ | 900,555 = | 655,639 |
| Neil Fiske[3] | $ 595,053 x | 125% x ( | N/A x | 50% + | N/A x | 50%) = | N/A - | N/A = $ | 743,819 |
| Brent Hyder | $ 686,537 x | 80% x ( | 9% x | 50% + | 175% x | 50%) = $ | 506,654 - $ | 391,258 = | 115,396 |

122.     The 2020 Proxy Statement also contained a proposal asking shareholders to approve an advisory vote on executive compensation.  The proposal stated:

Pursuant to Section 14A of the Securities Exchange Act, the Company is providing shareholders with an annual advisory (non-binding) vote on the overall compensation of our named executive officers. Accordingly, the following resolution will be submitted for a shareholder vote at the 2020 Annual Meeting:

"RESOLVED, that the shareholders of The Gap, Inc. (the "Company") approve, on an advisory basis, the overall compensation of the Company's named executive officers, as described in the Compensation Discussion and Analysis section, the accompanying compensation tables, and the related narrative disclosure pursuant to Item 402 of Regulation S-K, set forth in the Proxy Statement for this Annual Meeting".

The Board and the Compensation and Management Development Committee, which is comprised entirely of independent directors, will consider the outcome of the shareholders' non-binding advisory vote when making future executive compensation decisions.

SHAREHOLDER DERIVATIVE COMPLAINT

As described in detail under the section entitled "Compensation Discussion and Analysis," our executive compensation program is designed to provide the level of compensation necessary to attract and retain talented and experienced executives, and to motivate them to achieve short-term and long-term goals, thereby enhancing shareholder value and creating a successful company. We are committed to tie pay to performance and continue to believe our executive compensation program meets each of our compensation objectives.

***We received approximately 57% of all votes cast in support of the overall compensation of our executives at our 2019 Annual Meeting of Shareholders. This was a departure from prior years, where support ranged from 97% to over 99%.***

123.    The Company's admission that the 2019 proposal regarding executive compensation was supported by only 57% of the shareholders voting at the 2019 Annual Meeting, compared to past approval percentages of 97-99%, demonstrates the shareholders' concern about executive compensation at Gap and shareholder discontent with the executives' stewardship of Gap.

124.    The issue of executive compensation for Gap's top executives was clearly something very important to the Company's shareholders, and the statements in the 2020 Proxy were meant to reassure shareholders about these pressing issues and convince them that Gap had meaningfully addressed the issues and taken necessary action, so that shareholders would vote in favor of the executive compensation matters set forth in the 2020 Proxy.  The Directors did not want to have another abysmal 57% vote on executive compensation such as that which occurred the prior year.  In light of the statements referenced above, which were meant to reassure shareholders, the statements assumed added importance and materiality.

125.    The 2020 Proxy stated:

At our 2019 Annual Meeting, our Say-on-Pay vote was approved by 57% of shareholder votes. This was a departure from prior years, which ranged from 97% to over 99%. Given the lower Say-on-Pay vote at our 2019 Annual Meeting, we broadened our shareholder outreach in anticipation of our 2020 Annual Meeting and conducted outreach to shareholders

48

representing approximately 45% of our total shares outstanding, which does not include the 43% of the outstanding shares owned by members of the Fisher family. In addition, we will be conducting further shareholder outreach following the 2020 Annual Meeting. Based on shareholder outreach conducted during the 2019 and 2020 proxy seasons, we believe that this lower support was in large part due to a one-time grant of restricted stock units made to our former CEO in June 2018. The Board approved this grant in light of significant organizational and strategic changes we were making under his leadership, and to create further alignment with shareholder interests. In November 2019, Mr. Peck was terminated without cause and all 345,303 shares under his June 2018 grant were canceled.

In response to concerns expressed by our shareholders in connection with our long-term incentive program, Management and the Committee spent time during fiscal 2019 to consider modifications to the program, including the performance metrics used. As a result, we aligned on certain changes to our compensation program and practices, as summarized in the following table. We believe these changes will further tie executive pay to company performance. As in prior years, we continued to set rigorous goals and align pay delivery with performance. We also continue to put executive compensation to an advisory shareholder vote annually.

126.     The 2020 Proxy stated that certain changes were made to executive compensation based on shareholder discontent with the compensation of the former CEO of the Company (Defendant Peck), and that Peck's 345,303 restricted stock units granted in 2018 were canceled, but Peck's termination was still characterized as "without cause," thus allowing Peck to receive substantial benefits upon his departure from the Company.   The Proxy stated: "Mr. Peck received separation benefits based on his termination without cause, as required under his Post-Termination Benefits Agreement, which is further described in '2019 Potential Payments Upon Termination'."   The payments made by Gap to Mr. Peck even though he was fired are set forth in the following chart:

/ / /

/ / /

49

SHAREHOLDER DERIVATIVE COMPLAINT

**POST-TERMINATION PAYMENTS**

Mr. Peck was terminated without cause from the position of President & CEO, Gap Inc. in November 2019 and Mr. Fiske was terminated without cause from the position of President & CEO, Gap in January 2020. As a result of Mr. Peck's and Mr. Fiske's termination, each became eligible to receive post-termination benefits under their respective agreements.

The following table shows the amounts that Mr. Peck and Mr. Fiske are eligible to receive in connection with their terminations in 2019:

| | 2019 Post-Termination Payments | |
|---|---|---|
| **Description** | **Mr. Peck** | **Mr. Fiske** |
| Cash Payments related to salary(1) | $2,325,000 | $1,425,000 |
| Cash Payments related to bonus(2) | — | — |
| Health Benefits | 21,851 | 28,474 |
| Financial Counseling | 22,950 | 22,950 |
| Stock Award Vesting Acceleration(3) | 1,380,491 | — |
| **Total** | **3,750,292** | **1,476,424** |

127.     Moreover, the 2020 Proxy, while purporting to disclose changes made to the executive compensation structure at Gap due to shareholder discontent about pay to Defendant Peck and others, and poor performance at the Company, continued to falsely claim that the Company's compensation structure for executives was properly designed and effective to promote the best interests of the Company.  The 2020 Proxy stated:

**COMPENSATION OBJECTIVES**

Our fiscal 2019 compensation program is intended to align total compensation for executives with the short and long-term performance of the Company, while enabling us to attract and retain executive talent. Specifically, the program is designed to:
   •Support a performance-oriented culture;
   •Support our business strategy by motivating and rewarding achievement of short and long-term objectives, as well as individual contributions;
   •Attract and retain executive talent;
   •Link executive rewards to shareholder returns; and
   •Promote a culture of executive stock ownership.

SHAREHOLDER DERIVATIVE COMPLAINT

*Our program rewards executives for the achievement of corporate and divisional financial and non-financial objectives, for their individual contributions to these results, and for optimizing long-term returns to shareholders*. The majority of each executive's total compensation opportunity is weighted toward incentive compensation tied to the financial performance of the Company and aligned to the long-term return to our shareholders. When we do not achieve targeted performance levels and/or our stock price does not appreciate, compensation that can be realized by our executives is substantially reduced. When we exceed targeted performance levels and/or our stock price appreciates, compensation that can be realized by our executives is substantially increased. We believe that this is the most effective means of aligning executive pay with our shareholders' interests.

128.   The 2020 Proxy also stated the following with respect to all compensation decisions by the Company's Compensation Committee:

In conducting its analysis and determining compensation, the Committee also considers the following factors where relevant:

- Business and talent strategies;

- The nature of each Executive's role;

- *Individual performance (based on specific financial and operating objectives for each Executive, as well as leadership behaviors)*;

- Future potential contributions by the Executive;

- Internal comparisons to other Executives;

- Internal consistency with our broad-based practices and programs;

- Comparisons of the value and nature of each compensation element to each other and in total; and

- Retention risk.

129.   The 2020 Proxy was false and misleading because it failed to disclose that executive compensation was not tied in any way to the achievement of increased diversity at the Company, and misleadingly stated that compensation was tied to "the achievement of . . . non-financial objectives."

51

SHAREHOLDER DERIVATIVE COMPLAINT

130.     Specifically, the 2020 Proxy stated that the Annual Cash Incentive Bonus was based on achievement of goals other than financial performance:

The annual incentive bonus was based on two components:

1.     **Financial Performance Component**. 70% of the total opportunity was based on the financial performance of the Company or a division of the Company; of this, 100% was based on earnings, given the importance of accountability for operating results, except for the Old Navy division, for which 75% was based on earnings and 25% on net sales, to drive top-line focus.

2.     **Performance Culture/Corporate Objectives Component**. *30% of the total opportunity was based on demonstration of performance behaviors and achievement of corporate objectives*. Gap Inc. earnings threshold must be met in order for this component to fund.

131.     More specifically, with respect to the Cultural/Corporate Objectives Component, the 2020 Proxy stated:

**Performance Culture/Corporate Objectives Component**
A portion of the Executives' bonuses were based on progress towards company separation and demonstration of performance behaviors. As with the Financial Component, the Committee approved threshold, target and maximum performance funding goals for the performance culture/corporate objectives component based on Gap Inc. earnings at the beginning of the performance period. Payouts would be made under the performance culture/business objectives component only if threshold goals are achieved. The funding would then be adjusted based on a subjective assessment of progress towards corporate objectives and demonstration of the company or division's performance behaviors that lead to a high performing culture.

132.     The 2020 Proxy stated that no executive received an annual cash incentive bonus due to failure to achieve the goals of the Financial Performance Component, but failed to describe whether any executive met the goals set forth in the Culture/Corporate Objective Component.   The Proxy was thus false and misleading since it failed to disclose whether the Company's top executives met the Culture/Corporate Objectives' goals, and failed to even set forth what the goals are.   Based on the Company's prominent statements that "We are inclusive, by design. Intentionally. Specifically.  With

SHAREHOLDER DERIVATIVE COMPLAINT

purpose,"[26] and representation that the achievement of the Culture/Corporate Objective Component represented a 30% weighting of the annual cash bonus, the Proxy Statements should have disclosed the specific criteria of this component and whether the executives had met the goals.

133.    Moreover, the Company has repeatedly and prominently represented to shareholders that achieving diversity is not only a key goal, but actually a mandate:

> "*Being an inclusive company isn't optional. For us, striving for equality is just as much of a <u>business imperative</u> today as it was 50 years ago when we started out.  We are inclusive, by design. Intentionally. Specifically. With purpose.*"[27]

134.    The Gap also has repeatedly represented to its shareholders that it actively and "aggressively" evaluates the composition of its Board to ensure compliance with not just the law, but also its own stated corporate governance principles.  The Company's Investor Relations website states:

> *Gap Inc. will continue to aggressively evaluate the skill set of our board against* our business needs to ensure our standards not only meet the requirements of the law, but are consistent with *our shareholders' best interests and corporate governance best practices*.[28]

135.    Given these statements by the Company, and the representation in the 2019 and 2020 Proxy Statements that a portion of executive compensation is tied to the achievement of Culture/Corporate Objectives, the 2019 and 2020 Proxy Statements should have disclosed information about whether the Company's executives and directors were being successful in achieving the diversity mandate.  Because they

---

[26] *See* https://www.gapinc.com/en-us/values/diversity-inclusion, last visited July 27, 2020.

[27] *See* https://www.gapinc.com/en-us/values/diversity-inclusion, last visited July 27, 2020.

[28] *See* https://www.gapinc.com/en-us/about/leadership/board-of-directors, last visited Aug. 12, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

1  omitted this key information, the 2019 and 2020 Proxy Statements contained material

2  omissions and were misleading.

3      136.   The proposals in the 2019 and 2020 Proxy Statements regarding executive

4  compensation were also false and misleading because the proxies failed to disclose that

5  the executives' achievement of performance goals was based in part on unlawful and

6  discriminatory hiring, promotion, and pay practices.   The compensation plans gave

7  Defendants a strong incentive to continue concealing the true nature of the Company's

8  discriminatory practices in order to boost the Company's reported financial performance

9  and achieve the performance measures such as earnings, financial return ratios, net

10  income, and stock price, for which they could be awarded bonuses.

11     137.   The false statements had their desired effect.  At Gap's annual meeting on

12  May 21, 2019 and May 19, 2020, all the incumbent white directors were reelected.  No

13  competing Black or minority candidates made it on the ballot.   The proposal seeking an

14  advisory vote regarding executive compensation was approved.   Deloitte was

15  reappointed as the Company's auditor.

16     138.   Gap published the results of the voting at its annual meeting in a Form 8-K

17  filed on May 22, 2019:

18
19     On May 21, 2019, the Company held its Annual Meeting in San Francisco, California. As of March 25,
   2019, the Company's record date for the Annual Meeting, there were a total of 379,014,042 shares of Common
20  Stock outstanding and entitled to vote at the Annual Meeting. At the Annual Meeting, 350,594,208 shares of
   Common Stock were represented in person or by proxy and, therefore, a quorum was present.

21     The shareholders of the Company voted on the following items at the Annual Meeting:
   1.    Election of the Directors nominated by the Board of Directors.
22

| Nominee | For | Against | Abstain | Broker Non-Votes |
|---|---|---|---|---|
| Amy Bohutinsky | 330,950,322 | 353,906 | 220,781 | 19,069,199 |
| John J. Fisher | 326,752,314 | 4,570,406 | 202,289 | 19,069,199 |
| Robert J. Fisher | 265,349,360 | 65,978,981 | 196,668 | 19,069,199 |
| William S. Fisher | 326,749,755 | 4,574,204 | 201,050 | 19,069,199 |
| Tracy Gardner | 330,790,676 | 495,268 | 239,065 | 19,069,199 |
| Isabella D. Goren | 330,957,839 | 344,796 | 222,374 | 19,069,199 |
| Bob L. Martin | 317,688,622 | 13,614,125 | 222,262 | 19,069,199 |
| Jorge P. Montoya | 324,961,013 | 6,341,688 | 222,308 | 19,069,199 |

54

| Chris O'Neill | 329,881,822 | 1,420,458 | 222,729 | 19,069,199 |
| Art Peck | 328,920,509 | 2,394,498 | 210,002 | 19,069,199 |
| Lexi Reese | 330,914,932 | 389,763 | 220,314 | 19,069,199 |
| Mayo A. Shattuck III | 318,576,443 | 12,727,525 | 221,041 | 19,069,199 |

Based on the votes set forth above, the director nominees were duly elected.

2. Ratification of the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending February 1, 2020.

| **For** | **Against** | **Abstain** |
| --- | --- | --- |
| 338,823,874 | 11,576,178 | 194,156 |

Based on the votes set forth above, the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending February 1, 2020 was duly ratified.

3. Approval, on an advisory basis, of the overall compensation of the Company's named executive officers.

| **For** | **Against** | **Abstain** | **Broker Non-Votes** |
| --- | --- | --- | --- |
| 188,083,003 | 142,728,444 | 713,562 | 19,069,199 |

Based on the votes set forth above, the overall compensation of the Company's named executive officers was approved.

4. Approval of the amendment and restatement of The Gap, Inc. 2016 Long-Term Incentive Plan.

| **For** | **Against** | **Abstain** | **Broker Non-Votes** |
| --- | --- | --- | --- |
| 246,767,682 | 84,414,078 | 343,249 | 19,069,199 |

Based on the votes set forth above, the amendment and restatement of The Gap, Inc. 2016 Long-Term Incentive Plan was approved.

139. On May 21, 2020, Gap published the results of the voting at its 2020 annual meeting in a Form 8-K, which stated:

On May 19, 2020, The Gap, Inc. (the "Company") held its annual meeting of shareholders (the "Annual Meeting"). As of March 23, 2020, the Company's record date for the Annual Meeting, there were a total of 372,639,457 shares of Common Stock outstanding and entitled to vote at the Annual Meeting. At the Annual Meeting, 346,354,687 shares of common stock were represented in person or by proxy and, therefore, a quorum was present.

SHAREHOLDER DERIVATIVE COMPLAINT

The shareholders of the Company voted on the following items at the Annual Meeting:

1. Election of the directors nominated by the Board of Directors.

| Nominee | For | Against | Abstain | Broker Non-Votes |
|---|---|---|---|---|
| Amy Bohutinsky | 326,000,192 | 1,233,834 | 142,601 | 18,978,060 |
| John J. Fisher | 321,251,085 | 6,015,367 | 110,175 | 18,978,060 |
| Robert J. Fisher | 316,487,476 | 10,778,266 | 110,885 | 18,978,060 |
| William S. Fisher | 321,279,626 | 5,974,507 | 122,494 | 18,978,060 |
| Tracy Gardner | 322,192,644 | 5,046,610 | 137,373 | 18,978,060 |
| Isabella D. Goren | 325,901,912 | 1,331,271 | 143,444 | 18,978,060 |
| Bob L. Martin | 320,818,131 | 6,352,713 | 205,783 | 18,978,060 |
| Amy Miles | 326,861,611 | 370,933 | 144,083 | 18,978,060 |
| Jorge P. Montoya | 321,175,827 | 6,054,307 | 146,493 | 18,978,060 |
| Chris O'Neill | 325,375,027 | 1,854,085 | 147,515 | 18,978,060 |
| Mayo A. Shattuck III | 313,869,391 | 13,357,472 | 149,764 | 18,978,060 |
| Elizabeth A. Smith | 326,849,358 | 379,971 | 147,298 | 18,978,060 |
| Sonia Syngal | 323,350,480 | 3,889,197 | 136,950 | 18,978,060 |

Based on the votes set forth above, the director nominees were duly elected.

2. Ratification of the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending January 30, 2021.

| For | Against | Abstain |
|---|---|---|
| 333,872,033 | 12,381,462 | 101,192 |

Based on the votes set forth above, the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending January 30, 2021 was duly ratified.

3. Approval, on an advisory basis, of the overall compensation of the Company's named executive officers.

| For | Against | Abstain | Broker Non-Votes |
|---|---|---|---|
| 317,222,519 | 9,922,108 | 232,000 | 18,978,060 |

Based on the votes set forth above, the overall compensation of the Company's named executive officers was approved.

SHAREHOLDER DERIVATIVE COMPLAINT

140.    The 2019 and 2020 Proxy Statements were materially misleading because they failed to disclose:

(a)    That the statement "*director nominees are identified and considered based on knowledge, experience, integrity, leadership, reputation, background, viewpoint, qualifications, gender, race/ethnicity, personal characteristics,* and ability to understand the Company's business" was not accurate, since the Company's decisions do not take into consideration ethnicity and race even if the other stated factors are also considered;

(b)    That the Company's decision to retain directors who have been on the Board as long as 30 years (such as Mr. Fisher) is not due to a desire to retain the "experience" of the incumbent Director Defendants, but instead to keep minorities off the Board;

(c)    That the Company's reason for not publishing an annual diversity and/or pay report regarding minorities is due to a desire to conceal existing, known pay disparity adversely affecting Blacks and minorities at the Company, and the failure to promote minorities to leadership and executive positions at the Company;

(d)    That the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(e)    That the Board's Governance and Sustainability Committee did not take racial and ethnic diversity into consideration when evaluating potential Board candidates, and instead simply claimed to do so in order to create a false appearance of compliance with the law and false appearance of being a good corporate citizen;

(f)  That Defendants had knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and

SHAREHOLDER DERIVATIVE COMPLAINT

equal access, and that unlawful discrimination exists at the Company;

(g)   That Defendants had knowledge of continuing violations of federal policies and laws due to discriminatory hiring, pay, and promotion practices that adversely affected Blacks and minorities;

(h)   That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and anti-discrimination were being complied with;

(i)   That Defendants failed to appropriately address the Company's lack of racial and ethnic diversity and discriminatory practices towards minorities in hiring and promotion and misleading claims regarding the same; and

(j)   That, as a result, the Company was at substantial risk of large monetary fines, penalties, and adverse judgments in lawsuits due to the fact that the Company was not in compliance with federal and state laws regarding hiring, promotion, and pay practices.

141.   The 2019 and 2020 Proxy Statements harmed the Company by interfering with the proper governance on its behalf that requires stockholders' informed voting of directors. As a result of the false or misleading statements in the 2019 Proxy, stockholders voted to reelect all of the Defendants to the Board and voted against requiring Gap to have an independent Chairman.

142.   The statements in the 2019 and 2020 Proxy Statements conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability."   In reality, the Company's corporate governance structure and defective internal controls allowed senior executives and the Board to sidestep real accountability and instead continue perpetuating the discriminatory practices that led to the lack of racial and ethnic diversity at Gap, and other discrimination in hiring and promotion practices and lack of diversity on both the Board and management.

SHAREHOLDER DERIVATIVE COMPLAINT

143.    The 2019 and 2020 Proxy Statements, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to reelect all of the Defendants to the Board while they were breaching their fiduciary duties to the Company and deliberately concealing material information concerning the Company's discrimination against Black individuals and other minorities and its effects on the Company's business and reputation.

144.    The Company and its shareholders were harmed by the approval of incentive compensation awards to certain of the Individual Defendants, such as executive officers, who helped perpetrate the illegal discriminatory hiring and compensation practices.  Had shareholders known of the underlying misconduct at the Company, they would not have voted to keep the same Directors who were allowing the illegal practices to continue.  Even if the alleged fraudulent discriminatory practices began before the Proxy Statements issued, they continued after the Proxy Statements issued because Board members elected by shareholders pursuant to the Proxy Statements allowed the practice to continue.

145.    As the saying goes, the rich get richer while the poor get poorer.  Serving on Gap's Board has enriched the already-rich elites whose profitable sinecure has been perpetuated by the Defendants' wrongdoing.  Many qualified Black and minority candidates would benefit greatly from the prestige and compensation that comes with a position on Gap's Board.  The following chart sets forth the compensation earned by outside directors on Gap's Board in 2019:

/ / /

/ / /

/ / /

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

# DIRECTOR COMPENSATION SUMMARY

The following table sets forth certain information regarding the compensation of Gap's directors who served in fiscal 2019, which ended February 1, 2020.

| Name[1] | Fees Earned or Paid in Cash ($) | Stock Awards ($)[2] | Option Awards ($)[3] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($)[4] | Total ($) |
|---|---|---|---|---|---|---|
| Amy Bohutinsky | 92,000 | 105,628 | — | — | 1,570 | 199,198 |
| John J. Fisher | 80,000 | 105,628 | — | — | — | 185,628 |
| William S. Fisher | 80,000 | 159,987 | — | — | 15,000 | 254,987 |
| Tracy Gardner | 96,000 | 159,987 | — | — | — | 255,987 |
| Brian Goldner[5] | 46,000 | — | — | — | — | 46,000 |
| Isabella D. Goren | 96,000 | 159,987 | — | — | 10,000 | 265,987 |
| Bob L. Martin | 133,750 | 159,987 | — | — | 12,500 | 306,237 |
| Jorge P. Montoya | 103,000 | 159,987 | — | — | 10,870 | 273,857 |
| Chris O'Neill | 92,000 | 159,987 | — | — | 880 | 252,867 |
| Lexi Reese | 89,000 | 105,628 | — | — | 2,500 | 197,128 |
| Mayo A. Shattuck III | 124,000 | 159,987 | — | — | 15,000 | 298,987 |

## E.     The Directors' Roles and Committees at Gap

146.    The following chart lists the directors of Gap as set forth in the Company's most recent Proxy Statement and the committees on which they serve:

| Name | Audit & Finance | Compensation & Management Development | Governance & Sustainability |
|---|---|---|---|
| Amy Bohutinsky | ● | | |
| John J. Fisher | | | |
| Robert J. Fisher[1] | | | Chair |
| William S. Fisher | | | |
| Tracy Gardner[2] | | Chair | ● |
| Isabella D. Goren | ● | | |
| Amy Miles | | | |
| Bob L. Martin[3] | | | |
| Jorge P. Montoya | | ● | |
| Chris O'Neil | | ● | |
| Lexi Reese (not standing for reelection) | | ● | |
| Mayo A. Shattuck III | Chair | | ● |
| Elizabeth Smith | | | |
| Sonia Syngal | | | |
| *Number of Meetings* | **8** | **10** | **13** |

SHAREHOLDER DERIVATIVE COMPLAINT

**F.     The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure Diversity on the Board and Among Managers and Executives at the Company**

147.     The Director Defendants have known for years that Gap has lacked racial and ethnic diversity on the Board, and that the diversity that the Company trumpets among employees has been primarily limited to increasing the hiring of minorities for low-level, low-paying positions, and that the Company has not promoted diversity (or been successful at it) with respect to leadership positions.

148.     Defendants' knowledge is reflected by the fact that Gap publishes limited data about its minority employees, which reflects the fact that Blacks constitute just 4% of employees at the Company's San Francisco headquarters.  In addition, the Directors have taken steps to conceal pay inequity among minorities.  Gap publishes a Gender Pay Equity report, but the information in the report is limited to an analysis of gender pay equity, and does not contain any information about minority pay equity and does not analyze or disclose information about the percentage of minorities holding leadership positions at the Company.

149.     Moreover, the Company recently admitted that it has not ensured racial and ethnic diversity in its workforce.  The Company stated:

> We believe our teams should look like the communities we serve. While, we are well represented by gender, ***we have work to do across all levels and functions to fully represent Black and Latinx employees***.[29]

150.     The Director Defendants were aware of this and were complicit in these acts, thus demonstrating their scienter about Gap's failure to ensure diversity and failure to pay minorities equal pay.

---

[29] *See* https://www.gap.com/browse/info.do?cid=1160596&ak_t=74E8807F7793274F464FD8B911DB651717DC9574CD6400000359305FE5525074, last visited August 9, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

151.    Gap's silence about the lack of diversity on its Board at the time that many corporations are openly expressing outrage at the murders of George Floyd, Breonna Taylor, and Ahmaud Arbery, among others, reflects the misleading nature of Gap's professed commitment to diversity in its proxy statements.

152.    Now, more than ever, corporations are recognizing that silence equates to complicity in the fight against systemic racism.  Over the last month, in response to the public indignation over these murders, dozens of corporations have publicly condemned racism and showed solidarity for Black Lives Matter, pledging to donate millions of dollars to anti-discrimination efforts and programs to support Black businesses.[30]

153.    Although many of these companies stood on the sidelines for much too long and were silent in the wake of the deaths of Eric Garner and Michael Brown,[31] this recent corporate outpouring is a meaningful first step that could lead to serious and significant changes in how corporations combat systemic racism within their own workforces.

154.    Indeed, while many companies have only made public statements or

---

[30]  David Hessekiel, "*Companies Taking a Public Stand in the Wake of George Floyd's Death*," FORBES (June 4, 2020), at https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/#1a8f9b8e7214; Tiffany Hsu, "*Corporate Voices Get Behind 'Black Lives Matter' Cause*," NEW YORK TIMES (May 31, 2020), at https://www.nytimes.com/2020/05/31/business/media/companies-marketing-black-lives-matter-george-floyd.html; Rachael Myrow, "*Silicon Valley's Black Employees Question Corporate Claims That Black Lives Matter*," KQED (June 18, 2020), at https://www.kqed.org/news/11824857/silicon-valleys-black-employees-question-corporate-claims-that-black-lives-matter; David Gelles, "*Corporate America Has Failed Black America*," NEW YORK TIMES (June 6, 2020), at https://www.nytimes.com/2020/06/06/business/corporate-america-has-failed-black-america.html?referringSource=articleShare.

[31]  Jay Peters, "*Big Tech Companies Are Responding to George Floyd in a Way They Never Did for Michael Brown*," THE VERGE (June 12, 2020), at https://www.theverge.com/2020/6/5/21281017/amazon-apple-facebook-response-george-floyd-michael-brown-tech-companies-google.

SHAREHOLDER DERIVATIVE COMPLAINT

pledged to donate money to anti-racist causes, other companies and corporate executives are looking inward and taking more meaningful measures to address racial discrimination in hiring and promotion.  For example:

     a.     Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to diversity metrics.[32]

     b.     PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers.[33]

     c.     Adidas committed to filling 30% of new positions with Black or Latino workers.[34]

     d.     Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-white board, urged the board to fill his seat with a Black candidate, and pledged to use future gains on his Reddit stock to serve the Black community, starting with Colin Kaepernick's Know Your Rights Camp.[35]

     155.     Gap has remained conspicuously silent about *racial and ethnic diversity* on

---

[32] David Gelles, "*Corporate America Has Failed Black America*," NEW YORK TIMES (June 6, 2020), at https://www.nytimes.com/2020/06/06/business/corporate-america-has-failed-black-america.html?referringSource=articleShare.

[33] Ramon Laguarta, "*PepsiCo CEO: 'Black Lives Matter, to our company and me.' What the food and beverage giant will do next*," FORTUNE (June 16, 2020), at https://fortune.com/2020/06/16/pepsi-ceo-ramon-laguarta-black-lives-matter-diversity-and-inclusion-systemic-racism-in-business/?utm_source=email&utm_medium=newsletter&utm_campaign=ceo-daily&utm_content=2020061711am.

[34] *Message from the Adidas Board: Creating Lasting Change Now* (June 9, 2020), at https://www.adidas-group.com/en/media/news-archive/press-releases/2020/message-adidas-board-creating-lasting-change-now/.

[35] Megan Rose Dickey, "*Unpacking Tech's Response to the Killing of George Floyd*," TECHCRUNCH (June 9, 2020), at https://techcrunch.com/2020/06/09/unpacking-techs-response-to-george-floyds-death/.

SHAREHOLDER DERIVATIVE COMPLAINT

its Board in the wake of George Floyd's murder.[36]  Gap's silence on this key issue is telling, and surprising, given its repeated statements in its Proxy that racial and ethnic diversity on the Company's Board is supposedly critical to the Board's effective oversight of management:

> *The board believes that diversity, including differences in backgrounds, qualifications, experiences, and personal characteristics, including gender and ethnicity/race, is important to the effectiveness of the board's oversight of the company. Nominees are pre-screened to ensure each candidate has qualifications which complement the overall core competencies of the board.*[37]

### G.    The Unjust Compensation Awarded to the Individual Defendants

156.    Some of the Defendants received unjust compensation and/or compensation and payments that were higher due to Defendants' wrongdoing and because the Company was more profitable by paying Black individuals and minorities less.

157.    The Fisher family, as the Company's largest shareholder, received substantially more in dividends from their Gap stock than they would have but for the wrongdoing.  If Black and minority employees working at Gap had received fair and equal pay, Gap would have had higher compensation expenses and thus the dividend payments would have been lower.  Again, the Fisher family was the largest beneficiary of the inflated dividend payments because they own 43.2% of the stock of the Company, as reflected in the attached chart from the 2020 Proxy Statement which presented

---

[36] Ed Targett, "*Here's How Big Tech's CEOs Have Reacted to America's Raging Protests*," COMPUTER BUSINESS REVIEW (June 2, 2020), at https://www.cbronline.com/list/big-tech-ceos-george-floyd.

[37] *See* Gap's Corporate Governance Guidelines, available at https://www.gapinc.com/CMSPages/GetAzureFile.aspx?path=~\gapcorporatesite\medi a\images\docs\corporate-governance-guidelines.pdf&hash=78a71f377bc1f82e1a6f01eb728cb6bc7355b07f5a1c019107c022b79605 f454.

SHAREHOLDER DERIVATIVE COMPLAINT

information, as of March 23, 2020 with respect to the beneficial ownership of Gap common stock:

**Shares Beneficially Owned**

| Name of Beneficial Owner | Common Stock | Awards Vesting Within 60 Days[1] | | % of Total Class[2] |
|---|---|---|---|---|
| Directors and Named Executive Officers | | | | |
| Amy Bohutinsky | — | 12,081 | 12,081 | * |
| Mark Breitbard | 48,565 | 397,500 | 446,065 | * |
| John J. Fisher[3] | 65,086,872 | 12,081 | 65,098,953 | 17.5% |
| Robert J. Fisher[4] | 46,385,596 | 21,998 | 46,407,594 | 12.5% |
| William S. Fisher[5] | 55,752,385 | 21,998 | 55,774,383 | 15.0% |
| Neil Fiske[6] | — | 62,500 | 62,500 | * |
| Tracy Gardner | 10,537 | 21,998 | 32,535 | * |
| Isabella D. Goren | 23,171 | 21,998 | 45,169 | * |
| Julie Gruber | 40,876 | 214,300 | 255,176 | * |
| Teri List-Stoll | 97,014 | 247,500 | 344,514 | * |
| Bob L. Martin | 51,700 | 21,998 | 73,698 | * |
| Amy Miles[7] | — | 27,164 | 27,164 | * |
| Jorge P. Montoya | 39,881 | 21,998 | 61,879 | * |
| Chris O'Neill | — | 16,443 | 16,443 | * |
| Art Peck[8] | 295,856 | 2,262,818 | 2,558,674 | * |
| Lexi Reese[9] | — | 12,081 | 12,081 | * |
| Mayo A. Shattuck III | 101,440 | 31,801 | 133,241 | * |
| Elizabeth Smith[7] | — | 27,164 | 27,164 | * |
| Sonia Syngal | 93,915 | 563,750 | 657,665 | * |
| All directors and executive officers, as a group (20 persons)[10] | 167,688,224 | 1,791,883 | 169,480,107 | 45.3% |

158.    As the Proxy further clarified: "The aggregate total beneficial ownership of Mrs. Doris F. Fisher and Messrs. John J. Fisher, Robert J. Fisher, and William S. Fisher, including charitable entities for which one or more of the Fishers is a trustee, is 43.2% of the outstanding shares."

/ / /

/ / /

/ / /

65

SHAREHOLDER DERIVATIVE COMPLAINT

159.     Based on publicly available information, the Fisher Defendants and other Defendants have received substantial unjust compensation from the dividends.  Gap's dividend payments in both 2018 and 2019 were $0.97 per share according to the following chart from the Company's 2020 Form 10-K:

| Dividends Declared and Paid | | |
|---|---|---|
| | Fiscal Year | |
| | 2019 | 2018 |
| 1st Quarter | $0.2425 | $0.2425 |
| 2nd Quarter | 0.2425 | 0.2425 |
| 3rd Quarter | 0.2425 | 0.2425 |
| 4th Quarter | 0.2425 | 0.2425 |
| | $   0.97 | $   0.97 |

160.     Because the Gap has 371,301,527 shares outstanding, and Gap paid dividends of $0.97 per share in both 2018 and 2019, the Fisher family received $155,590,192 in dividends in 2018 and $155,590,192 dividends in 2019.  Moreover, since Gap has paid $0.486 so far in 2020, and the Fisher family owns 160,402,260 Gap shares, the Fisher family has been paid dividends of $77,955,498 in 2020.  From 2018 to the date of the filing of this complaint, therefore, the Fisher family has caused Gap to pay it total dividends of $389,135,882.

161.     At the same time that the Fisher family was paying itself hundreds of millions of dollars, Gap's performance has substantially underperformed in the market, as demonstrated from the following chart from the Company's 2020 Form 20-K:

///

///

///

///

SHAREHOLDER DERIVATIVE COMPLAINT



## TOTAL RETURN TO STOCKHOLDERS
### (Assumes $100 investment on 1/31/2015)

**Total Return Analysis**

|  | 1/31/2015 | 1/30/2016 | 1/28/2017 | 2/3/2018 | 2/2/2019 | 2/1/2020 |
|---|---|---|---|---|---|---|
| The Gap, Inc. | $100.00 | $61.73 | $ 58.63 | $ 86.27 | $ 69.54 | $ 50.97 |
| S&P 500 | $100.00 | $99.33 | $119.24 | $150.73 | $147.24 | $179.17 |
| Dow Jones U.S. Apparel Retailers | $100.00 | $98.72 | $ 97.30 | $110.74 | $120.36 | $134.15 |

162.    In addition to its poor performance, Gap paid dividends to the Fisher family even though it did not have enough free cash flow to cover the dividend in 2019. As one commentator noted:

> Gap paid out more free cash flow than it generated - 121%, to be precise - last year, which we think is concerningly high. We're curious about why the company paid out more cash than it generated last year, since this can be one of the early signs that a dividend may be unsustainable.  Gap paid out less in dividends than it reported in profits, but unfortunately it didn't

generate enough cash to cover the dividend. Cash is king, as they say, and were Gap to repeatedly pay dividends that aren't well covered by cashflow, we would consider this a warning sign.[38]

163.    These dividend payments were higher than they would have been but for the lower wages paid to Black, female, and minority employees.  As a result, the Individual Defendants received, at a minimum, inflated and unjust dividend payments from Gap.

164.    The Individual Defendants' receipt of this compensation during the relevant time period was unjust in light of their direct participation in the wrongful conduct alleged herein, which constituted bad faith and disloyal conduct.  The Defendants' receipt of such compensation while they were knowingly or recklessly breaching their fiduciary duties to the Company constitutes unjust compensation that should be recouped by Gap.

165.    The following table provides additional information regarding some of the Officer Defendants' compensation during part of the relevant time period:

| | | Stock Awards ($)[4][5] | Option Awards ($)[6][5] | Non-Equity Incentive Plan Compensation ($)[7] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)[8] | All Other Compensation ($)[9] | Total ($) |
|---|---|---|---|---|---|---|---|
| **Robert Fisher** Interim President and CEO, Gap Inc. | 2019 | 297,250 | — | 159,987 | — | — — 15,000 | 472,237 |
| **Teri List-Stoll** EVP and CFO, Gap Inc. | 2019 | 985,000 | — | 922,337 | 637,153 | — — 68,490 | 2,612,980 |
| | 2018 | 918,269 | 200,000 | 4,619,311 | 1,095,318 | 192,932 — 472,764 | 7,498,594 |
| | 2017 | 891,827 | 200,000 | 647,204 | — | 1,476,896 — 329,997 | 3,545,924 |
| **Mark Breitbard** President and CEO, Banana Republic | 2019 | 1,025,000 | 500,000 | 1,775,905 | 1,583,042 | — — 71,155 | 4,955,102 |
| | 2018 | 950,000 | 500,000 | 1,221,947 | 1,408,266 | 655,639 — 68,688 | 4,804,540 |
| | 2017 | 730,769 | — | 4,361,174 | 1,549,290 | 669,769 — 29,178 | 7,340,180 |

[38] See "Dividend Investors: Don't Be Too Quick To Buy The Gap, Inc. (NYSE:GPS) For Its Upcoming Dividend," SIMPLY WALL STREET, Oct. 3, 2019, available at https://finance.yahoo.com/news/dividend-investors-dont-too-quick-095920584.html, last visited Aug. 11, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

| Name | Year | Salary | Bonus | Stock Awards | | | | All Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Julie Gruber** <br> EVP, Global General Counsel and Chief Compliance Officer, Gap Inc. | 2019 | 744,231 | — | 1,583,106 | 318,577 | — | — | 57,348 | 2,703,262 |
| **Sonia Syngal** <br> President and CEO, Old Navy | 2019 | 1,100,000 | — | 2,036,465 | 1,556,932 | — | — | 72,565 | 4,765,962 |
| | 2018 | 1,079,808 | — | 1,931,049 | 1,408,266 | 65,909 | — | 68,708 | 4,553,740 |
| | 2017 | 958,173 | — | 1,779,318 | 1,091,820 | 2,175,093 | — | 76,032 | 6,080,436 |
| **Art Peck** <br> Former President and CEO, Gap Inc. | 2019 | 1,365,192 | | 4,609,096 | 2,896,150 | — | — | 52,147 | 8,922,585 |
| | 2018 | 1,526,442 | — | 15,135,207 | 3,911,850 | — | — | 220,440 | 20,793,939 |
| | 2017 | 1,396,058 | — | 6,762,235 | 3,275,460 | 4,045,859 | — | 107,574 | 15,587,186 |
| **Neil Fiske** <br> Former President and CEO, Gap | 2019 | 913,462 | 400,000 | 786,382 | 1,042,614 | — | | 365,748 | 3,508,206 |
| | 2018 | 595,577 | — | 4,443,018 | 1,952,675 | 743,819 | — | 289,856 | 8,024,945 |

166.    The Officer Defendants' compensation during the relevant period was also unjust because it significantly exceeded the average employees' pay, as disclosed by the Company in its Proxy:

**Relationship Between CEO and Median Employee Annual Total Compensation**

For fiscal year 2018, using the methodology described below, we determined that the employee with the median annual total compensation of our employees (the "median employee") was a part-time sales support associate located in Maryland and the employee's total compensation in fiscal year 2018 was $5,831. We did not annualize employee compensation. *The annual reported compensation of our CEO for that same period was $20,793,939. Accordingly, the ratio of the median employee pay to CEO pay for 2018 is 1 to 3,566,* which was calculated in compliance with the requirements set forth in Item 402(u) of SEC Regulation S-K.[39]

167.    If the 2018 compensation of Gap's CEO was 3,566 times the median employee's compensation, then it must have been an even higher multiple of the median Black or minority employee's compensation given the government's allegations that Gap unlawfully paid such employees less than other employees for similar jobs.

---

[39] *See* Gap 2019 Proxy Statement at p. 47.

SHAREHOLDER DERIVATIVE COMPLAINT

168.    When viewed in light of these facts, the Defendants' compensation was unjust under equitable principles.

169.    The following chart provides information about the compensation that the Director Defendants received during 2019:

| [1] | Fees Earned or Paid in Cash ($) | Stock Awards ($)[2] | Option Awards ($)[3] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($)[4] | Total ($) |
|---|---|---|---|---|---|---|
| Amy Bohutinsky | 92,000 | 105,628 | — | — | 1,570 | 199,198 |
| John J. Fisher | 80,000 | 105,628 | — | — | — | 185,628 |
| William S. Fisher | 80,000 | 159,987 | — | — | 15,000 | 254,987 |
| Tracy Gardner | 96,000 | 159,987 | — | — | — | 255,987 |
| Brian Goldner[5] | 46,000 | — | — | — | — | 46,000 |
| Isabella D. Goren | 96,000 | 159,987 | — | — | 10,000 | 265,987 |
| Bob L. Martin | 133,750 | 159,987 | — | — | 12,500 | 306,237 |
| Jorge P. Montoya | 103,000 | 159,987 | — | — | 10,870 | 273,857 |
| Chris O'Neill | 92,000 | 159,987 | — | — | 880 | 252,867 |
| Lexi Reese | 89,000 | 105,628 | — | — | 2,500 | 197,128 |
| Mayo A. Shattuck III | 124,000 | 159,987 | — | — | 15,000 | 298,987 |

170.    The following table shows all stock options exercised and the value realized upon exercise, and all stock awards vested and the value realized upon vesting, by the Company's named executive officers during fiscal 2019, which ended on February 1, 2020.

| | Option Awards | | Stock Awards[1] | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| Robert Fisher | — | — | 8,903 [2] | 159,987 |
| Teri List-Stoll | — | — | 25,000 | 463,250 |
| Mark Breitbard | — | — | 37,500 | 964,875 |
| Julie Gruber | — | — | 18,043 | 460,779 |
| Sonia Syngal | — | — | 40,427 | 1,034,776 |
| Art Peck | — | — | 127,692 | 3,270,790 |
| Neil Fiske | — | — | 32,500 | 588,250 |

70

SHAREHOLDER DERIVATIVE COMPLAINT

171.   The Defendants' compensation, excess dividends, and stock awards detailed herein were unjust and should be disgorged or returned by such Defendants because they acted in bad faith and in a disloyal manner by virtue of the conduct alleged in this complaint.

## VIII.   THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES

172.   The Company has suffered significant harm and damages due to Defendants' wrongdoing and breaches of duties.

173.   As a direct and proximate result of the Individual Defendants' conduct, the Company has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to, the amounts paid to outside lawyers, accountants, and investigators in connection with internal and external investigations into issues pertaining to the lack of diversity at Gap, discrimination lawsuits, harassment claims, wrongful termination lawsuits, and lack of pay equity claims.

174.   Moreover, Gap's reputation, goodwill, and market capitalization have been harmed as a result of the Individual Defendants' misconduct.

175.   Further, as a direct and proximate result of the Individual Defendants' actions, Gap has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)   costs incurred from having to hire new employees, as employees have quit in protest over Defendants' misconduct and the discriminatory practices employed by Gap;

(b)   costs incurred from defending and paying settlements in discrimination lawsuits, since the Individual Defendants' wrongdoing caused discrimination to proliferate at Gap;

(c)   costs incurred from defending and settling governmental investigations into the Individual Defendants' misconduct;

(d)   loss of reputation; and

SHAREHOLDER DERIVATIVE COMPLAINT

(e)    costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Gap.

## IX.    DEMAND FUTILITY

176.    Plaintiff brings this action derivatively in the right and for the benefit of Gap to redress injuries suffered, and to be suffered, by Gap and its stockholders as a direct result of the Officer Defendants' violations of federal securities laws and breaches of fiduciary duties.

177.    Gap is named as a nominal defendant solely in a derivative capacity.

178.    This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

179.    At the time this action was commenced, Gap's Board consisted of the following 13 members: Bohutinsky, Miles, Goren, Martin, O'Neill, Smith, John Fisher, Montoya, Shattuck, Syngal, Gardner, Robert J. Fisher, and William S. Fisher.

180.    Plaintiff has not made any demand on Gap to institute this action because such a demand would be a futile, wasteful, and useless act.

181.    Under Delaware law, demand is futile if a majority of the directors are either interested in or not independent of a person interested in the claims asserted.

182.    Based on these principles, demand is futile here if seven (7) of the thirteen (13) directors are either interested in or not independent of a person interested in the claims asserted herein.  As discussed below, demand is futile because (i) the Officer Defendants face a substantial likelihood of liability for violating the federal securities laws and breaching their duty of due care; (ii) the Fisher family members are controlling shareholders and are not independent; and (iii) at least four other directors are not independent of the Officer Defendants.

### A.    Demand Is Futile Against the Officer Defendants

183.    The Officer Defendants served as officers of Gap (and directors) during the Relevant Period.  As officers, the Officer Defendants face a substantial likelihood of

SHAREHOLDER DERIVATIVE COMPLAINT

1    liability if there is reason to doubt that they breached their duty of care — *i.e.*, acted with
2    gross negligence.

3    184.   As alleged above, the Officer Defendants knowingly or recklessly made or
4    disseminated materially false and misleading statements regarding the Company's
5    diversity, board qualifications, and efforts to recruit minorities.  As such, the Officer
6    Defendants face a substantial likelihood of liability for violating their fiduciary duties of
7    candor and good faith and the federal proxy laws.

8    185.   Further, Defendant Syngal is not independent because she is the President
9    and CEO of Gap.  The Company admits in its SEC filings that Syngal is not independent.
10   Moreover, a significant portion of Syngal's compensation is incentive-based, which
11   means that she was personally incentivized to perpetuate misconduct (such as that
12   described herein) that artificially inflates the performance of the Company. As a
13   Company executive, she had exposure to and knowledge of the wrongdoing alleged,
14   including any "red flags." Syngal cannot realistically distance herself from the
15   misconduct alleged herein. Syngal is therefore incapable of impartially considering a
16   demand to commence this action.

17   186.   For these reasons, demand is futile against the Officer Defendants.

18   **B.     Demand is Futile as to the Fisher Family Directors Because They are
19           Controlling Shareholders and are Not Independent**

20   187.    As alleged herein, the Fisher family directors own 43.2% of Gap's shares
21   and are controlling shareholders.  Demand is thus futile.

22   188.   Moreover, the Fisher family members (Directors John Fisher, Robert J.
23   Fisher, and William S. Fisher) are interested because they have received unjust financial
24   benefits as a result of the wrongdoing.  As alleged *supra*, from 2018 to the date of the
25   filing of this complaint, the Fisher family has caused Gap to pay it total dividends of
26   $389,135,882.

27   189.   Moreover, the Fisher defendants completely dominate and control Gap.
28   The Fisher family founded Gap and has at all times been the controlling shareholder and

73

1  also dominated the Board.  Three separate Fisher family members currently sit on the

2  Board.  The Company's 2020 Proxy stated the following with respect to Defendant

3  Robert J. Fisher: "Interim President and Chief Executive Officer of Gap Inc. from January

4  2007 to August 2007 and November 2019 to March 2020. Chairman of the Board of Gap

5  Inc. from 2004 to August 2007 and February 2015 to March 2020. Managing Director,

6  Pisces, Inc. since 2010. Executive of Gap Inc. from 1992 to 1999. Various positions with

7  Gap Inc. from 1980 to 1992."

8      190.    Given their domination and control of Gap, including their huge stock

9  holdings and financial interest in the challenged conduct, Defendants Robert J. Fisher,

10  William S. Fisher, and John J. Fisher are interested and lack independence.   Thus,

11  demand is futile as to them.

12      **C.    Demand Is Excused Because a Majority of the Director Defendants is
            Either Not Independent or is Conflicted Because These Defendants Face
13          a Substantial Likelihood of Liability Arising From Their Misconduct**

14      191.    Even if knowingly presiding over illegal conduct somehow falls within the

15  ambit of the business judgment rule (which it does not), demand is also futile and

16  excused because a majority of the members of the Board are not disinterested or

17  independent and cannot, therefore, properly consider any demand.

18      192.    Furthermore, Defendants Bohutinsky, Goren, Gardner, Montoya, and

19  Shattuck have all been members of the Audit Committee during the relevant period, and

20  are conflicted from considering a demand because they each face a substantial likelihood

21  of liability as a result of their conduct on the committee. As stated in the 2020 Proxy

22  Statement, the Audit Committee's charter imposes specific duties on members of this

23  committee to, among other things, review the Company's practices with respect to risk

24  assessment and risk management and meet with management and members of internal

25  audit to discuss the Company's significant risk exposures and the steps management has

26  taken to monitor, control and mitigate such exposures.

27      193.    In accordance with its charter, the Audit Committee also reviews the

28

SHAREHOLDER DERIVATIVE COMPLAINT

1   Company's policies and practices with respect to the financial reporting and control
2   aspects of risk management, and must review the status of risk oversight activities
3   performed by the Board and its other committees.

4   194.   As members of the Audit Committee, Defendants Bohutinsky, Goren,
5   Gardner, Montoya, and Shattuck violated their fiduciary duties to act in good faith to
6   address the pervasive legal violations discussed herein, including the unlawful pay
7   equity gap and discrimination against minorities with respect to hiring and promotion.
8   Accordingly, Defendants Bohutinsky, Goren, Gardner, Montoya, and Shattuck face a
9   substantial likelihood of liability and cannot impartially consider a demand. Therefore,
10   demand is excused with respect to these defendants.

11   195.   Furthermore, the Director Defendants were on the Board during the
12   relevant period, and thus were exposed to and had knowledge of the "red flags" alleged
13   herein regarding unlawful discrimination and failure to abide by the Company's stated
14   policies to promote diversity. The directors' inaction in the face of red flags subjects
15   them to a substantial likelihood of liability for their conduct and, therefore, demand is
16   excused.

17   196.   The Board is likewise conflicted from and unable to pursue the Company's
18   claims against members of the Company's management. Any effort to prosecute such
19   claims against these Defendants for their direct roles in implementing a business
20   strategy designed to ignore or otherwise circumvent federal and state laws prohibiting
21   discrimination would necessarily expose the Board's own culpability for the very same
22   conduct. In other words, given that the Board had been on notice of the wrongdoing, any
23   effort by the Board to hold Defendants liable would surely lead these executives to
24   defend on the ground that their own conduct was consistent with the Company's
25   corporate policy and practice, as established by and known to the Board.

26   / / /

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

**D.      The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith**

197.      Under Delaware law and the Company's Corporate Governance Principles, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance. This is particularly true when such compliance concerns a core operation of the Company such as its employment practices and Board nomination process. Here, the misconduct alleged was pervasive, took place over many years, and involved the Company's core business operations since the employment practices affected all Company operations. Organized and long-running violations of the law do not result from an isolated failure of oversight. The entire Board was obligated to oversee the Company's risk, including potential liability for the Company's violations of federal and state laws regarding discrimination. At the very least, the Director Defendants consciously turned a blind eye to these pervasive violations of law, creating a substantial likelihood of liability. Accordingly, demand is excused.

198.      All of the Board's directors, at the time this action was initiated, failed to act in the face of known duties. Indeed, as explained herein, they were presented with – but consciously ignored (and/or perpetuated) – substantial "red flag" warnings that the Company was discriminating against Blacks and other minorities with respect to hiring, promotion, and evaluation of Board candidates.  The Board also knew that the Company's workforce has consistently only had 4% or less African American workers at its headquarters, and a very small percentage of African Americans in leadership positions.  The Board was also aware of other systematic discrimination at the Company against minorities, and has attempted to conceal the discrimination by failing to publish a minority Pay Equity Gap Report and instead only publishing data about gender pay equity.

199.      These and other wrongful acts have caused and will continue to cause the Company to be subjected to significant potential fines and penalties and numerous

SHAREHOLDER DERIVATIVE COMPLAINT

1  lawsuits. They have also resulted in severe harm to the Company's business reputation.

2  Since the wrongdoing and harm alleged in this Complaint flows directly from the

3  Board's conscious decision to permit the sustained and systemic violations of law in

4  question, the Director Defendants are incapable of exercising the independent judgment

5  required to determine whether the initiation of an action against the Defendants is

6  appropriate.

      **E.**     **Demand is Futile as to the Members of the Governance & Sustainability**
               **Committee**

      200.   During the relevant time, the Company's Governance & Sustainability

Committee was comprised of Defendants Robert J. Fisher, Bob Martin, Tracy Gardner,

and Mayo Shattuck.

      201.   The members of the Committee were responsible for the evaluation and

nomination of candidates to the Company's Board, and for ensuring that the Company

was complying with its stated Corporate Governance Principles.  Defendants Robert J.

Fisher, Bob Martin, Tracy Gardner, and Mayo Shattuck have breached their fiduciary

duties as directors by failing to fulfill these duties.  Rather than causing the Company to

comply with its corporate governance principles, Robert J. Fisher, Bob Martin, Tracy

Gardner, and Mayo Shattuck have caused the Company to merely pay lip service to

these principles.  Instead of recommending well-qualified Black and minority candidates

to serve on the Company's Board, Robert J. Fisher, Bob Martin, Tracy Gardner, and

Mayo Shattuck have perpetuated the incumbent Board, including the Fisher family

members, under the pretext that the existing members' "experience" and long tenure on

the Board is beneficial to Gap.

      202.   The Proxy Statements represented that the Governance and Sustainability

Committee identified and recruited Board nominees *"**based on knowledge, experience,**

***integrity, leadership, reputation, background, viewpoint, qualifications, gender,***

***race/ethnicity, personal characteristics,**"* whereas in reality Gap has not actively sought

to recruit minorities and has just attempted to create the false impression that it is

SHAREHOLDER DERIVATIVE COMPLAINT

1    "committed" to doing so.  This is the very definition of a misleading statement, and

2    Defendants Robert J. Fisher, Bob Martin, Tracy Gardner, and Mayo Shattuck knew the

3    statements were false because they were the ones identifying and evaluating Board

4    candidates and they knew that they were not appropriately considering racial and ethnic

5    diversity in the process.  They thus acted in a disloyal and bad faith manner and

6    breached their duty of candor – conduct which cannot be indemnified under Delaware

7    law.  Demand is thus futile as to Robert J. Fisher, Bob Martin, Tracy Gardner, and Mayo

8    Shattuck.

9    203.    Moreover, to entrench themselves and their fellow directors in office, all

10   the Director Defendants have opposed term limits in order to prevent the addition of

11   qualified Blacks and minorities to the Board.

12   **X.     CAUSES OF ACTION**

13   **COUNT I**

**Breach of Fiduciary Duty**

14   **Against All Individual Defendants and Does 1–30**

15   204.    Plaintiff incorporates by reference and realleges each and every allegation

16   contained above, as though fully set forth herein.

17   205.    The Individual Defendants and Does 1–30 owed and owe the Company

18   fiduciary obligations.  By reason of their fiduciary relationships, the Individual

19   Defendants owed and owe the Company the highest obligation of good faith, fair

20   dealing, loyalty, and due care.

21   206.    The Individual Defendants and Does 1–30, and each of them, as a result of

22   the facts alleged herein, violated and breached their fiduciary duties of candor, good

23   faith, and loyalty.

24   207.    As a direct and proximate result of the Individual Defendants' and Does 1–

25   30's breaches of their fiduciary obligations, the Company has sustained significant

26   damages, as alleged herein.  As a result of the misconduct alleged herein, defendants are

27   liable to the Company.

28
78

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against All Individual Defendants and Does 1–30**

208.    Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

209.    Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

210.    The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

211.    Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties.  Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

212.    The Company was injured as a direct and proximate result of the aforementioned acts.

**COUNT III**
**Abuse of Control**
**Against Defendants Robert J. Fisher, Sonia Syngal,**
**Arthur Peck, John J. Fisher, William S. Fisher, and Doris F. Fisher**

213.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

214.    By virtue of their positions and financial holdings at Gap, defendants Robert J. Fisher, Sonia Syngal, Arthur Peck, John J. Fisher, William S. Fisher, and Doris F. Fisher exercised control over Gap and its operations, and owed duties as controlling persons to Gap not to use their positions of control for their own personal interests and contrary to Gap's interests.

79

SHAREHOLDER DERIVATIVE COMPLAINT

215.     Defendants' conduct alleged herein constitutes an abuse of their ability to control and influence the Company, for which they are legally responsible.

216.     As a result of defendants' abuse of control, the Company has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

217.     Because the acts of defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, Plaintiff on behalf of the Company is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**COUNT IV**
**Unjust Enrichment**
**Against All Individual Defendants and Does 1–30**

218.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

219.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

220.     During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

221.     Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

222.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

/ / /

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

**COUNT V**
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**Against All Individual Defendants**

223.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

224.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

225.    Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2018 & 2019 Proxy Statements.  The 2018 & 2019 Proxy Statements contained proposals to the Company's stockholders urging them to reelect the members of the Board, approve executive pay packages, and reelect Deloitte as the Company's auditor. The 2019 and 2020 Proxy Statements were materially misleading because they failed to disclose:

(a)    That the statement "*director nominees are identified and considered based on knowledge, experience, integrity, leadership, reputation, background, viewpoint, qualifications, gender, race/ethnicity, personal characteristics*, and

SHAREHOLDER DERIVATIVE COMPLAINT

ability to understand the Company's business" was not accurate, since the Company's decisions do not take into consideration ethnicity and race even if the other stated factors are also considered;

(b)     That the Company's decision to retain directors who have been on the Board as long as 30 years (such as Mr. Fisher) is not due to a desire to retain the "experience" of the incumbent Director Defendants, but instead to keep minorities off the Board;

(c)     That the Company's reason for not publishing an annual diversity and/or pay report regarding minorities is due to a desire to conceal existing, known pay disparity adversely affecting Blacks and minorities at the Company;

(d)     That the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(e)     That the Board's Governance and Sustainability Committee did not take racial and ethnic diversity into consideration when evaluating potential Board candidates, and instead simply claimed to do so in order to create a false appearance of compliance with the law and false appearance of being a good corporate citizen;

(f)     That Defendants had knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access, and that unlawful discrimination exists at the Company;

(g)     That Defendants had knowledge of continuing violations of federal policies and laws due to discriminatory hiring, pay, and promotion practices that adversely affected Blacks and minorities;

(h)     That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and anti-discrimination were being complied with;

SHAREHOLDER DERIVATIVE COMPLAINT

    (i)     That Defendants failed to appropriately address the Company's lack of racial and ethnic diversity and discriminatory practices towards minorities in hiring and promotion and misleading claims regarding the same; and

    (j)     That, as a result, the Company was at substantial risk of large monetary fines, penalties, and adverse judgments in lawsuits due to the fact that the Company was not in compliance with federal and state laws regarding hiring, promotion, and pay practices.

226.    The Defendants knew of, but failed to disclose, fraudulent business practices at Gap that put the Company at material risk — namely, discriminatory hiring, promotion, and compensation practices. Had this information been disclosed, shareholders would not have voted to reelect Board members, approve executive compensation packages, and re-hire Deloitte as the Company's auditor.

227.    By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to reelect the current Board, approve executive compensation, and re-hire Deloitte.

228.    Plaintiff, on behalf of the Company, seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2019 and 2020 annual meetings. Plaintiff does not seek any monetary damages for the proxy law violations.

229.    This action was timely commenced within three years of the date of the 2018 Proxy and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, requests judgment and relief as follows:

A.   Against all of the Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company along with pre- and post-judgment interest as allowed by law resulting from Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, and violation of the federal proxy laws;

B.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(1)   a proposal to require at least two current Directors to resign from the Board and replace such Directors with two Black persons;

(2)   a proposal to institute salary history bans in order to help eliminate the racial pay equity gap;

(3)   all Director Defendants named in this suit should return all their 2020 compensation received from Gap (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(4)   publication of an annual Diversity Report that contains more particularized information regarding the hiring, advancement, promotion, and pay equity of all minorities at Gap;

(5)   creation of a $700 million fund to hire Black and minority employees, promote them to more management positions at the Company,

84

establish and maintain a mentorship program at Gap for Black and minority employees that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(6)     requirement of annual training of Gap's entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(7)     immediately setting specific goals with respect to the number of Black and minority candidates to hire at the Company over the next five years, and Gap should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals;

(8)     replacement of Deloitte & Touche LLP as its auditor.  Gap is one of Deloitte's largest customers, and Deloitte has served as Gap's auditor *since 1976*, giving rise to a cozy and clubby relationship between Deloitte and Gap which is not conducive to effective auditing.  The Company's compliance with its stated policies concerning the commitment to diversity has been non-existent.  The very purpose of an auditor is to assess the Company's internal controls and determining if they are functioning effectively.  Rather than doing so, Deloitte has wrongfully and consistently given Gap's internal controls a clean bill of health and has failed to point out the obvious – that Gap lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment;

(8)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater non-controlling shareholder input into the policies and guidelines of the Board;

SHAREHOLDER DERIVATIVE COMPLAINT

(9)     a proposal to strengthen Gap's oversight of its procedures regarding the termination of employees, executives, and board members accused of discrimination;

(10)    a proposal to strengthen internal controls concerning discrimination;

(11)    a proposal to eliminate the use of Non-Disclosure Agreements at the Company so that current and former employees can report any and all instances of suspected discrimination without threat of legal action; and

(12)    a proposal to eliminate the use of mandatory arbitration for employee disputes and claims of wrongful termination and discrimination.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Gap has an effective remedy;

D.     Awarding to Gap restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.     Awarding punitive damages at the maximum amount permitted by law;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

SHAREHOLDER DERIVATIVE COMPLAINT

### DEMAND FOR JURY TRIAL

Plaintiff, on behalf of Gap, hereby demands a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated:  September 1, 2020

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne Beste (SBN 326881)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
Email:    fbottini@bottinilaw.com
achang@bottinilaw.com
abeste@bottinilaw.com

*Attorneys for Plaintiff Noelle Lee*

SHAREHOLDER DERIVATIVE COMPLAINT

DocuSign Envelope ID: C49866BE-6DA9-4937-996B-9A8C835A7FC3

## VERIFICATION

I, Noelle Lee, verify that I am a shareholder of The Gap, Inc.  I have reviewed the allegations in this Verified Shareholder Derivative Complaint.  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2020.

_____                          _____

Noelle Lee